**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

JOHN D. EULIANO, as Trustee of the JOHN D. EULIANO
REVOCABLE TRUST UTD 5-27-14, individually,
BREVARD NURSING ACADEMY, LLC
D/B/A COASTAL TECHNICAL INSTITUTE, individually,
COLE BRANTLEY, individually,
and CGB LOIS T, LLC, individually,
and on behalf of all others similarly situated,

        Plaintiffs,                      **CASE NO. 26-cv-60646**

    v.

ALSTON & BIRD, LLP

        Defendant.
--------------------------------------------------------x

## CLASS ACTION COMPLAINT

       Plaintiffs, JOHN D. EULIANO, as Trustee of the John D. Euliano Revocable Trust Utd 5-27-14 and BREVARD NURSING ACADEMY, LLC D/B/A COASTAL TECHNICAL INSTITUTE, individually, COLE BRANTLEY, individually, and CGB LOIS T, LLC, individually, and on behalf of all others similarly situated, by and through undersigned counsel, bring this action against Defendant ALSTON & BIRD LLP ("Alston & Bird"), and alleges as follows:

**NATURE OF THE ACTION**

1.      This action arises from a massive cryptocurrency Ponzi scheme orchestrated by Goliath Ventures, Inc.[1] ("Goliath") and its principals, including CEO Christopher Delgado. Masquerading as a "Joint Venture" to evade federal and state securities registration requirements, Goliath solicited hundreds of millions of dollars from investors, including Plaintiffs, by promising "guaranteed" monthly returns of 4% (48% annually) generated through purported cryptocurrency "liquidity pools."

2.      Goliath could not have gotten away with this massive fraud without the help of its law firm, Alston & Bird. Defendant Alston & Bird is one of the largest law firms in the United States. In most instances, its reputation precedes it.

3.      Delgado started the Goliath enterprise in or around 2023, signing up investors through joint venture agreements drafted before Alston & Bird's involvement. Later, in 2025, Alston & Bird was hired by Delgado to redo the agreements with investors who were already joint venturers, to assure that all investors were subject to identical JVAs. Alston & Bird inherited a joint venture with hundreds, if not thousands of joint venture "Partners", to whom it immediately owed legal and fiduciary duties. Regardless of who ultimately signed Alston & Bird's retainer agreement, Defendant was retained to provide legal services to the joint venture, including Plaintiffs and all Class members.

4.      In structuring and legally endorsing the Goliath joint venture enterprise, Alston & Bird abandoned the very duties that give its reputation value. It drafted the governing joint venture agreements ("JVAs"), engineered the legal architecture through which investor funds, including

---

[1] Goliath was formerly a Florida entity that later became a Wyoming entity. All references to "Goliath" refer to both entities.

retirement funds, were solicited and transferred, and issued legal assurances intended to induce reliance by investors and custodial institutions. Alston & Bird enabled the structure that caused investors to commit millions of dollars to a fatally defective enterprise—losses that were foreseeable, preventable, and directly traceable to the legal framework it designed.

5.      Alston & Bird architected the legal framework through which investor funds and retirement funds were solicited, pooled, transferred, and deployed. Defendant, upon information and belief, drafted a key legal Opinion Letter which Goliath and its principals used to justify its representation that its enterprise was legitimate and was not subject to the securities laws when, in fact, it was illegitimate and unavoidably subject to securities regulations.

6.      Further, the JVAs drafted by Defendant created Florida joint ventures— partnerships under Florida law—thereby making Alston & Bird not only legal counsel to Goliath and its principals, but also to each one of the joint venturers. Indeed, as worded, Goliath itself was the "joint venture" and the JVA defined each investor as a "Partner"—using the term "Partner" when referring to Plaintiffs 96 times in each JVA. The JVAs also established fiduciary obligations running to those partner-investors.

7.      In general, Defendant created and Goliath deployed two separate but related scams: The first, a general investment pool, whereby investors would provide fiat currency or digital currency to Goliath for investment into liquidity pools, in exchange for monthly returns based upon trading in the pool—a security under *Howey* if there ever was one (the "LP Scam"). The second, a program where Goliath would facilitate the creation and management of a self-directed independent retirement account or IRA, whereby it solicited and purported to invest investor funds into Goliath through the investors' IRA ("IRA Scam"). Importantly, both the LP Scam and the IRA Scam could not have happened without the JVAs.

8.      Defendant knew that retirement investors lacked access to internal information and would rely upon the integrity and independence of legal counsel structuring the enterprise. Despite this, Defendant facilitated a structure riddled with conflicts, opacity, and foreseeable risk, while permitting investor-facing reliance upon its legal work product.

9.      As a direct and proximate result, investors suffered catastrophic financial losses. Accordingly, Plaintiffs bring this class action lawsuit to hold Alston & Bird accountable for its legal malpractice, breaches of fiduciary duty, and constructive fraud.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

11.     This Court has personal jurisdiction over Defendant because Defendant purposefully directed conduct into Florida and this District that gives rise to Plaintiffs' claims, including drafting and supplying the JVAs and investor-intended legal assurances that Defendant knew would be used to solicit, obtain, and retain investor funds from persons located in this District, and because the resulting injury was suffered in this District by investors who were induced to invest and/or to refrain from redeeming based on the legal framework and investor-facing assurances Defendant provided.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including (i) the promotion and solicitation of Goliath investments from within Miami-Dade and Broward Counties; (ii) investor-facing events and marketing activities held in this District to induce capital

contributions; (iii) the use and dissemination within this District of the JVAs and Defendant's investor-intended legal work product to secure investor and custodian approval and funding; and (iv) the resulting injuries to investors located in this District. By way of example, Goliath conducted investor-related solicitation and promotional activity in this District, including events at locations here such as a 2025 holiday event at the Fontainebleau Miami Beach. It publicly associated itself with a Fort Lauderdale address in Broward County and its registered agent was located there. Upon information and belief, Defendant's legal work was integral to, and was used to facilitate, the fundraising and investor inducement activities occurring in this District. Further, Defendant knew or reasonably should have known its legal opinion and JVAs would be disseminated to prospective investors and custodial institutions nationwide, including within the Southern District of Florida, and that investors within this District would rely upon those materials when deciding to invest.

13.     Venue is also proper in this District because this District represents a central locus of the Goliath investment scheme's investor solicitation and promotional activities. Indeed, the JVAs themselves contain a venue provision in Broward County, Florida. Courts routinely recognize that venue lies in districts where fraudulent investment schemes were marketed or where investors were solicited, even where particular defendants were located elsewhere, because those acts constitute substantial events giving rise to the claims.

<u>**PARTIES**</u>

14.     Plaintiff, John D. Euliano, as Trustee of the John D. Euliano Revocable Trust Utd 5-27-14 and Brevard Nursing Academy, LLC D/B/A Coastal Technical Institute are investors managed and controlled by Florida resident John Euliano, which entered into a Goliath Ventures Joint Venture Agreement and suffered substantial financial losses as a result of the LP Scam.

15.     Plaintiff, Cole Brantley, is an individual, sui juris, and a resident of the State of Florida.  Plaintiff Cole Brantley manages and controls CGB LOIS T, LLC, a limited liability company.   Both Plaintiff Cole Brantley and CGB LOIS T, LCC entered into a Goliath Ventures Joint Venture Agreement and suffered substantial financial losses as a result of the LP Scam and the IRA Scam.

16.     Defendant Alston & Bird LLP is a limited liability partnership organized under the laws of the State of Georgia. Alston & Bird maintains its principal place of business in Atlanta, Georgia, and conducts substantial business throughout the United States, including within the State of Florida. Indeed, at least 13 lawyers at Alston & Bird LLP currently maintain active licenses to practice law in the State of Florida, per the Florida Bar records. At all relevant times, Alston & Bird provided legal services in connection with the structuring, documentation, and issuance of legal opinions relating to the Goliath joint venture enterprise and purposefully directed legal work and communications into this District in connection with that representation.

## GENERAL FACTUAL ALLEGATIONS

### A.     The Ponzi Scheme

17.     Goliath offered victims the opportunity to participate in cryptocurrency "liquidity pools." A "liquidity pool" generally refers to a pool of deposited digital assets (often paired) used by an exchange or protocol to facilitate trading, and pool participants may earn fees generated by trades executed against the pool.

18.     Under written JVAs, Goliath represented—albeit falsely—that "Partner" funds would be deployed into cryptocurrency liquidity pools running on exchanges such as Uniswap, involving the pairing of cryptocurrencies to create liquidity and generate exchange fees.  In these JVAs, Goliath guaranteed return of principal.  Similarly, the JVAs, without exception, also contemplated withdrawal requests by email and return of funds within defined timeframes.  In

addition to guaranteeing return of principal, Goliath's JVAs also promised monthly profits/returns at strikingly high rates.

19.     After inducing millions of dollars in partner "contributions" under these JVAs, Goliath stopped honoring withdrawal obligations and stopped paying amounts owed in September of 2025, leaving investors unable to recover their principal and promised monthly distributions.

20.     In January 2026, Delgado was arrested by federal authorities on a criminal complaint charging him with wire fraud and money laundering. As alleged in the complaint, from January 2023 through January 2026, Delgado operated Goliath as a "Ponzi scheme," which is a form of investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors.

21.     Delgado's Ponzi scheme involved soliciting victims to invest substantial sums of money under false and fraudulent promises of monthly returns generated through cryptocurrency "liquidity pools." Victims were induced to give money to Goliath through personal referrals, professional marketing materials, luxury events, charitable sponsorships, and some monthly payments of purported returns, all of which were designed to establish Goliath's bona fides with investors. Based on these false and fraudulent representations, Goliath obtained at least $328 million from hundreds, or even thousands of victim investors, according to the federal government.

22.     Although Goliath represented that it would place the victim investors' funds in cryptocurrency liquidity pools, in reality, the funds were primarily used to pay purported returns to earlier investors, to return principal to investors who requested it, and for Goliath's extravagant business gatherings, Christmas parties, and luxury travel accommodations.

**B.      Alston & Bird's Essential Role in the Ponzi Scheme**

23.     Prior to the formation of Goliath's purported "liquidity pool," Christopher Delgado had encountered regulatory and business difficulties in connection with prior ventures, including disputes involving a prior venture known as "Liquidity Partners."

24.     Delgado represented that he intended to do things the right way going forward. In practice, however, what he sought was not compliance with federal and state securities laws, but a mechanism to avoid them—particularly the investor accreditation requirements, disclosure obligations, registration burdens, and compliance oversight that would otherwise apply to the capital-raising activities he planned to undertake.

25.     Upon information and belief, Delgado retained Defendant Alston & Bird to structure the enterprise and provide legal cover for the planned capital raise. Delgado and his agents communicated to Alston & Bird that he did not wish to limit fundraising to accredited investors or comply with the regulatory framework attendant to the offer and sale of securities. He did not want to make the required—protective—disclosures and did not. Instead, he sought an opinion that would permit Goliath to solicit funds broadly from individuals and entities—including retirement funds through self-directed IRAs—without complying with securities registration, exemption, disclosure, or accreditation requirements.

26.     Upon information and belief, Alston & Bird agreed to prepare an Opinion Letter addressing whether the proposed "liquidity pool" structure constituted a security. Despite the economic, structural, and practical realities of the contemplated transactions and returns, the Opinion Letter concluded that the structure would not implicate federal securities laws.

27.     Specifically, the Opinion Letter provided that Delgado and Goliath could raise capital from investors and channel those funds into a pooled enterprise through purported "joint

venture agreements" without triggering the regulatory obligations applicable to the offer and sale of securities.

28. In short, Alston & Bird made every investor a "Partner"—thereby creating duties owed to them—while simultaneously stripping those same "Partners" of the legal and regulatory protections that would normally apply to their investment. The firm did so without any disclosure in the JVAs and without the conflict disclosures required when counsel for a joint venture takes actions adverse to some of its partners.

29. Alston & Bird created the platform for Christopher Delgado to use Goliath to defraud hundreds of innocent people to whom Alston & Bird also owed a duty. They created the partnership and allowed Delgado and Goliath to destroy the investor partners.

30. Alston & Bird knew or, at a minimum, should have known that the substance of the liquidity pool arrangement bore the hallmarks of an investment contract under well-established federal law. Under the economic-realities framework articulated in *SEC v. W.J. Howey Co.*, an instrument constitutes a security where there is an investment of money in a common enterprise with an expectation of profits derived from the efforts of others.

31. Even more fundamentally, Alston & Bird rendered legal advice to a Florida corporation with a principal place of business in Florida. In Florida, a security includes, "[a]n investment contract," "[a] beneficial interest in title to property, profits, or earnings" and/or "[a]n interest in or under a profit-sharing or participation agreement or scheme."

32. Importantly too, upon information and belief, none of the lawyers providing this advice were licensed to practice law in the State of Florida. Upon information and belief, Alston & Bird's attorneys engaged in the unlicensed practice of law in Florida.

33.     The Goliath structure involved precisely that: participants invested capital into a centralized liquidity pool; funds were commingled; profits were promised based on the enterprise's trading and lending strategies; and all meaningful managerial and operational control rested exclusively with Delgado and his team. The mere labeling of participants as "joint venturers" or "partners" did not alter the economic substance of the transaction. What it did do, however, was trigger a duty owed by Alston & Bird to the partners or joint venturers in the joint venture it created and represented, and then facilitate securities fraud and other misconduct on behalf of one partner against the rest.

34.     Upon information and belief, the Opinion Letter authored by Alston & Bird relied heavily on the formalistic use of JVAs to characterize each participant as a "partner" rather than an investor. The JVAs repeatedly referred to capital contributors as "partners" and purported to grant them joint venture status. In reality, however, the agreements conferred no meaningful managerial control, voting authority, or operational participation to the capital contributors. Participants functioned as passive investors whose returns depended entirely on Delgado's efforts. As such, the arrangement satisfied the functional elements of an investment contract notwithstanding its nomenclature. What it did confer, however and as noted above, was a reasonable expectation by those "Partners" that the joint venture's lawyer, Goliath's lawyer, Alston & Bird would fulfill the duties owed to a partnership. It did not.

35.     Of course, joint ventures ordinarily come in two forms. The first, where no entity is formed and two parties join for a common purpose—good lawyers seek to avoid general partnership implications in this scenario. This is often called an "alliance." the other, a more formal joint venture an entity is formed the parties are "partners."

36.     Here, Alston & Bird created a joint venture with no entity—an alliance—except Alston & Bird also treated and in fact defined the investors as "Partners," not joint venturers, to avoid the securities laws. However, for taxation purposes, each "Partner" received a 1099 for profits not a K1, it was not treated as a partnership.

37.     The JVA also alludes to the fact that Goliath itself is the joint venture. Alston & Bird tried to thread a needle with no eye.

38.     In addition, it is nearly impossible to have a true joint venture for a liquidity pool investment which requires one party to invest money and the other to manage the money and do all the work. Indeed, in section 4.3 of the JVA, Goliath retained the ability to control "Partner" investments, methods, or operation in its sole discretion.

39.     Alston & Bird's structuring advice and opinion were not neutral academic exercises. Upon information and belief, the firm understood—or purported to understand—that a conclusion that the arrangement constituted a security would have required Goliath to either register the offering or strictly comply with exemptions that would significantly limit the pool of eligible investors and impose robust disclosure and compliance obligations.

40.     By opining that the structure fell outside the securities laws, Alston & Bird enabled Goliath to solicit funds broadly, including retirement assets through self-directed IRAs, without providing the protections mandated by federal and state securities regimes. It also provided an air of legitimacy to an otherwise illegitimate structure.

41.     The scheme engineered and endorsed by Alston & Bird was advantageous to Delgado and Goliath because it removed regulatory guardrails and expanded the universe of potential investors. It was likewise beneficial to Alston & Bird in that it preserved and expanded its professional engagement with Goliath. It was catastrophic, however, to the individuals induced

to contribute capital under the guise of joint venture participation. Operating outside the securities-law framework deprived investors of disclosure protections, regulatory oversight, and structural safeguards designed to prevent precisely the type of misconduct that followed. While it greatly benefited some of the partners in the joint venture it destroyed the lives and livelihoods of others.

42.     In substance, the JVAs created a pooled enterprise in which investors contributed at least $328 million in capital that was managed exclusively by Delgado and Goliath. By eschewing the securities-law framework, Goliath was able to operate without transparency, independent oversight, or mandated reporting, ultimately facilitating a massive Ponzi scheme that resulted in catastrophic losses to participants.

43.     As noted throughout, under the terms of the JVAs, each capital contributor was denominated a "Partner" in the enterprise with Goliath. To the extent the structure created a partnership or joint venture under applicable law, the duties owed by counsel to the joint venture enterprise extended to its partners. Alston & Bird undertook to structure and document the enterprise itself and to render legal opinions integral to its formation and capital-raising activities. In doing so, and particularly where its opinions were intended to induce investor and IRA-custodian reliance, Alston & Bird assumed duties not only to Delgado's corporate vehicle but also to the joint venture and its partners.

44.     Defendant failed to disclose material conflicts of interest, structural weaknesses, and foreseeable risks inherent in the design of the Goliath investment program.

45.     By designing and documenting the investment structure while permitting investors and financial intermediaries to rely upon its legal work, Defendant enabled a capital-raising scheme that ultimately resulted in hundreds of millions of dollars in investor losses.

46.     As a direct and proximate result of Alston & Bird's breaches of duty—including but not limited to negligent and/or knowingly improper legal opinions, structuring advice designed to circumvent securities protections, and the failure to recognize or disclose the securities-law implications of the arrangement—Plaintiffs and members of the Class were exposed to an unlawful and unsupervised capital-raising scheme. That exposure resulted in the loss of at least $328 million in invested funds, including substantial retirement savings placed at risk through self-directed IRA structures.

47.     But for Alston & Bird's opinion and structuring advice, the Goliath liquidity pool could not have been marketed and sold in the manner it was. The firm's conduct was a substantial factor in enabling the scheme to proceed and in causing the damages suffered by Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

48.     Plaintiffs bring this action individually and on behalf of a class of similarly situated persons pursuant to Rule 23 of the Federal Rules of Civil Procedure.

49.     Plaintiffs seek to represent a class defined as:

> All persons and entities who invested funds pursuant to Joint Venture Agreements with Goliath and suffered losses as a result of the LP Scam and/or the IRA Scam.

50.     Excluded from the class definition are 1) Defendant and any of its current or former officers, directors, employees, agents, or representatives; 2) any judge or magistrate assigned to this action, members of their staff, and any members of their immediate families; and 3) any person or entity whose total withdrawals, redemptions, or payments from Goliath exceeded the total amount of that person or entity's invested principal (i.e., "net winners").

51.     Plaintiffs reserve the right to modify or amend the Class definition as discovery and further investigation may warrant.

## A.     Numerosity

52.     The members of the proposed Class are so numerous that joinder of all members is impracticable.

53.     Public filings in the criminal case against Christopher Delgado and related investigative materials indicate that Goliath raised hundreds of millions of dollars from thousands of investors across multiple jurisdictions.

54.     The identities of many Class members are presently known only to Defendants and third-party custodians, including financial institutions and self-directed IRA custodians that processed investor funds.

55.     Given the substantial number of investors and the geographic dispersion of those investors, joinder of all Class members would be impracticable.

## B.     Commonality

56.     This action presents questions of law and fact common to the Class.

57.     These common questions include, but are not limited to:

a.     whether Defendant structured and documented the Goliath investment program through JVAs and related instruments;

b.     whether those agreements created a joint venture or partnership relationship among Goliath and investor participants;

c.     whether Defendant owed duties to the joint venture and its partners, including investor participants;

d.     whether Defendant knew or reasonably should have known that the Goliath investment program constituted the offer and sale of securities under federal and state law;

e.     whether Defendant negligently or improperly opined that the investment structure did not implicate securities laws;

f.     whether Defendant knew or reasonably should have known that investors and IRA custodians would rely upon its legal work in approving and funding investments;

14

g.      whether Defendant's structuring advice and opinion letters enabled Goliath to solicit and obtain investor funds;

h.      whether Defendant breached duties owed to Plaintiffs and the Class;

i.      whether Defendant's conduct was a substantial factor in causing investor losses; and

j.      the appropriate measure of damages sustained by the Class.

58.      These questions are capable of common proof and will generate common answers that drive the resolution of this litigation.

**C.      Predominance**

59.      Common questions of law and fact predominate over any questions affecting only individual Class members because Defendant's liability arises from a uniform course of conduct directed at the Goliath investment enterprise as a whole.

60.      As set forth above in the Commonality section, this action presents numerous common questions concerning Defendant's design, structuring, and legal validation of the Goliath investment program. Those questions arise from the same body of conduct—Defendant's drafting of the Joint Venture Agreements ("JVAs"), its legal structuring of the investment enterprise, and its issuance of the Opinion Letter concerning the regulatory status of that structure.

61.      Defendant's conduct did not involve individualized legal services directed to particular investors. Rather, Defendant structured a single investment program and prepared standardized legal instruments governing that program. Each investor participated pursuant to substantially identical JVAs drafted by Defendant, and the legality of that structure presents a common question capable of resolution on a class-wide basis.

62.      The central liability issues therefore concern Defendant's conduct in designing and legally endorsing the investment structure itself. Resolution of those issues will depend upon

common evidence, including the JVAs, the Opinion Letter, Defendant's communications with Goliath, and testimony concerning the structure and operation of the enterprise.

63.     Because Defendant's alleged misconduct concerns the creation and validation of a single investment framework used across the investor base, the determination of whether Defendant breached professional duties, owed fiduciary obligations to the joint venture enterprise and its partners, or engaged in constructive fraud will turn on evidence common to the Class rather than individualized proof.

64.     Any individualized issues that may arise relate primarily to the calculation of damages and do not defeat predominance. Investor losses can be determined through objective financial records reflecting the amounts contributed to and withdrawn from the Goliath investment program.

65.     Accordingly, the core issues in this litigation—whether Defendant negligently structured the enterprise, breached duties owed to the joint venture and its participants, and enabled the unlawful solicitation of investor funds—can be resolved through common proof applicable to the Class as a whole.

**D.     Typicality**

66.     Plaintiffs' claims are typical of the claims of the Class.

67.     Like all Class members, Plaintiffs invested funds in the Goliath investment program pursuant to a JVA structured and drafted by Defendant and implemented as part of the legal framework Defendant designed for the enterprise.

68.     Plaintiffs and Class members suffered losses as a result of the same course of conduct by Defendant, including Defendant's structuring of the investment program, drafting of the JVAs governing investor participation, and issuance of legal opinions addressing the regulatory status of the investment structure.

69.     Plaintiffs' losses, like those of the Class, arise from Defendant's uniform conduct in designing and legally endorsing the investment structure used across the investor base.

70.     Plaintiffs' claims arise from the same legal theories and operative facts as those of the Class and are therefore typical of the claims asserted on behalf of the Class.

**E.     Adequacy**

71.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.

72.     Plaintiffs' interests are aligned with those of the Class in seeking recovery for losses arising from the Goliath investment program. Plaintiffs have no interests antagonistic to those of the Class and is not subject to any unique defenses that would impair Plaintiffs' ability to represent the Class fairly and adequately. Plaintiffs understand the obligations of a class representative and is prepared to fulfill those duties, including participating in discovery, appearing for deposition or trial if necessary, and acting in the best interests of the Class.

73.     Proposed Class Counsel are experienced in prosecuting complex litigation, class actions, and financial fraud matters and have the resources necessary to litigate this action vigorously through trial. Proposed Class Counsel have extensive experience investigating and prosecuting investment-related misconduct and have devoted substantial time and resources to investigating the Goliath investment scheme.

74.     Indeed, prior to the arrest and indictment of Goliath's principal, Christopher Delgado, Proposed Class Counsel had already filed some of the first civil actions arising from the Goliath scheme on behalf of injured investors. Proposed Class Counsel were also the only lawyers to successfully seek the appointment of a receiver to protect remaining assets and preserve potential recoveries for investors.

75.     In addition, Proposed Class Counsel have engaged in extensive investigation of the Goliath scheme, including communications with hundreds of victims and analysis of the

investment structure used to solicit investor funds. Based on that investigation, Proposed Class Counsel are organizing claims not only against the primary wrongdoers but also against third parties that enabled the scheme, including Defendant Alston & Bird.

76.     Through these efforts, Proposed Class Counsel have developed substantial knowledge concerning the Goliath enterprise, the role played by its professional advisors, and the damages suffered by investors. Proposed Class Counsel have committed and will continue to commit the resources necessary to prosecute this action and obtain the best possible recovery for the Class.

77.     Accordingly, Plaintiffs and Proposed Class Counsel will fairly and adequately represent and protect the interests of the Class.

**F.     Superiority**

78.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

79.     The damages suffered by many Class members, while substantial, may not justify the cost, delay, and burden of individual litigation against a large international law firm with vast resources. Absent class treatment, many injured investors would face significant practical barriers to pursuing relief on their own, including the expense and complexity of litigating professional-liability claims arising from a large-scale financial fraud.

80.     Moreover, without a class action, litigation arising from the Goliath scheme would likely proceed in a fragmented and inefficient manner across multiple courts and jurisdictions, resulting in duplicative proceedings, inconsistent rulings, and the needless expenditure of judicial resources.

81.     Individual lawsuits would also create the risk of a race-to-the-courthouse in which similarly situated investors pursue separate claims based on the same underlying conduct, potentially leading to inequitable or inconsistent outcomes for victims of the same scheme.

82.     Because the claims in this case arise from Defendant's uniform conduct in designing and legally endorsing a single investment structure used across the investor base, resolving those issues in one coordinated proceeding will promote judicial efficiency and ensure consistent adjudication of the common legal and factual issues presented by Defendant's conduct.

83.     Class treatment will also ensure that similarly situated investors are treated equitably and that the costs of complex litigation are shared among those harmed by the same misconduct.

84.     Accordingly, a class action provides the most fair, efficient, and manageable method for resolving the claims arising from Defendant's role in enabling the Goliath investment scheme.

## CAUSES OF ACTION

### COUNT ONE
### PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

85.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–84 as if fully set forth herein.

86.     At all relevant times, Defendant Alston & Bird was a law firm engaged in the practice of law and held itself out as possessing specialized knowledge and expertise in securities regulation, investment structuring, and financial transactions.

87.     In connection with the formation and operation of the Goliath investment program, Defendant undertook to structure the enterprise, draft the governing JVAs and related transactional

documents, and render legal advice and opinions regarding the regulatory status of the investment structure.

88. The services performed by Defendant were not limited to internal advice to its client. Rather, Defendant structured the very investment vehicle through which capital was solicited from members of the public and prepared legal instruments and opinions intended to facilitate the participation of investors in that enterprise.

89. Defendant knew, or reasonably should have known, that prospective investors and financial intermediaries—including self-directed IRA custodians—would rely upon Defendant's legal work in evaluating the legitimacy and regulatory compliance of the Goliath investment program.

90. Defendant further knew that its structuring advice and legal opinions would be used to induce individuals and entities to contribute substantial capital to the enterprise through the JVAs. Alternatively, even if the enterprise ultimately did not constitute a valid joint venture or partnership, Defendant created and documented the legal framework through which investors were expressly represented to occupy that role and through which their capital was solicited and deployed. In doing so, Defendant knowingly placed investors in the position of relying upon the legal structure and documentation it prepared to define their rights, obligations, and legal relationship to the enterprise.

91. Under the terms of those agreements, each capital contributor was designated a "partner" in a joint venture with Goliath. To the extent the JVAs created a joint venture or partnership under applicable law, Defendant's legal services were rendered to the enterprise itself and therefore extended to its partners, including investor participants.

92.     Additionally, Defendant's legal services were performed for the benefit of, and with the foreseeable and intended reliance of, the investor participants whose capital was solicited pursuant to the JVAs. Indeed, the JVAs and Defendant's related legal work were specifically designed to enable the solicitation and acceptance of investor capital and to provide legal assurances regarding the legitimacy and regulatory status of the investment structure.

93.     As a result of these circumstances, Defendant owed duties of professional care to the joint venture enterprise and its investor partners, including investor participants, and/or intended beneficiaries of Defendant's legal services, including Plaintiffs and members of the Class. Under Florida law, attorneys may owe duties of care to intended third-party beneficiaries of their legal services even in the absence of strict privity where the legal work is undertaken for the primary purpose of benefiting or affecting those parties.

94.     Defendant owed Plaintiffs and the Class a duty to exercise the degree of care, skill, diligence, and competence that reasonably prudent attorneys would exercise under similar circumstances.

95.     Among other obligations, Defendant had a duty to:

a.      conduct reasonable diligence concerning the structure and operation of the investment program;

b.      ensure that the legal structure used to raise investor funds complied with applicable federal and state securities laws;

c.      accurately evaluate whether the investment structure constituted the offer and sale of securities under applicable law;

d.      avoid structuring transactions in a manner designed to circumvent investor-protection statutes;

e.      refrain from issuing legal opinions that were unsupported by the economic realities of the transaction; and

f.      warn foreseeable investors and intermediaries of material legal risks associated with the investment structure.

96.     Defendant breached these duties through multiple acts and omissions, including but not limited to:

   a.     structuring and documenting an investment program that, in economic substance, constituted the offer and sale of securities while representing that the structure fell outside the securities laws;

   b.     preparing JVAs that mischaracterized passive investors as "partners" despite the absence of meaningful managerial control;

   c.     issuing or authorizing legal opinions suggesting that the investment structure complied with applicable law when the economic realities of the transaction indicated otherwise;

   d.     failing to recognize or disclose that the structure exposed investors to significant regulatory and fraud-related risks; and

   e.     enabling the fundraising activities of Goliath without implementing safeguards or disclosures consistent with professional standards.

97.     Defendant knew or reasonably should have known that its legal work would be relied upon by investors and financial intermediaries in determining whether to approve and fund investments in the enterprise.

98.     Defendant's conduct fell below the professional standard of care applicable to attorneys engaged in structuring investment transactions and advising on securities-law compliance.

99.     Defendant's negligence was a substantial factor in enabling Goliath to solicit and obtain hundreds of millions of dollars from investors under the guise of joint venture participation.

100.    But for Defendant's deficient structuring advice and legal opinions, the Goliath investment program could not have been marketed and sold in the manner in which it was.

101.    Defendant's professional negligence exposed Plaintiffs and members of the Class to an unlawful and unsupervised investment scheme that ultimately collapsed.

102.     As a direct and proximate result of Defendant's breaches of duty, Plaintiffs and the Class suffered substantial damages, including the loss of invested capital and other consequential financial harm.

103.     Plaintiffs and the Class are therefore entitled to recover all damages caused by Defendant's professional negligence, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT TWO**
**<u>BREACH OF FIDUCIARY DUTY</u>**

104.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–85 as if fully set forth herein.

105.     The JVAs governing the Goliath investment program expressly designated investor participants as "partners" in a joint venture with Goliath.

106.     Under Florida law, a joint venture constitutes a form of partnership in which the participants owe fiduciary duties to one another and to the enterprise.

107.     Defendant Alston & Bird was retained to structure, document, and provide legal validation for the Goliath joint venture enterprise, including drafting the governing JVAs and issuing legal opinions regarding the regulatory status of the investment structure.

108.     In undertaking these responsibilities, Defendant provided legal services integral to the creation and operation of the joint venture itself.

109.     To the extent the JVAs created a partnership or joint venture under applicable law, Defendant's legal services were rendered to the joint venture enterprise and therefore extended to its partners, including investor participants such as Plaintiffs and members of the Class.

110.     Alternatively, even if the enterprise ultimately did not constitute a valid joint venture or partnership, Defendant created and documented the legal framework through which

23

investors were expressly represented to occupy that role and through which their capital was solicited and deployed. In doing so, Defendant knowingly placed investors in the position of relying upon the legal structure and documentation it prepared to define their rights, obligations, and legal relationship to the enterprise.

111.    Defendant further undertook legal services that were intended to benefit, and were foreseeably relied upon by, the investor participants whose capital was solicited through the JVAs. The JVAs and related legal documentation drafted by Defendant were not merely internal agreements between Goliath and its counsel; rather, they were the operative legal instruments governing investor participation in the enterprise and defining the rights and status of investor participants.

112.    Defendant knew, or reasonably should have known, that investors and financial intermediaries—including self-directed IRA custodians—would rely upon Defendant's legal work in evaluating the legitimacy and compliance of the investment structure.

113.    By structuring the enterprise, drafting the governing agreements, and issuing legal opinions designed to facilitate investor participation, Defendant assumed duties to the joint venture enterprise and to its partner-investors under principles including, but not limited to, the intended third-party beneficiary doctrine and the invited-reliance doctrine.

114.    Defendant's conduct also created a relationship of trust and confidence between Defendant and the investor participants whose rights and obligations were defined by the legal instruments Defendant drafted.

115.    As a result of these relationships and undertakings, Defendant owed fiduciary duties to Plaintiffs and members of the Class.

116.    These fiduciary duties included duties of loyalty, candor, independence, and good faith, as well as the duty to exercise reasonable professional judgment in structuring and validating the enterprise.

117.    Defendant also owed duties to avoid conflicts of interest, to refrain from facilitating unlawful or misleading investment structures, and to disclose material legal risks associated with the enterprise.

118.    Defendant breached its fiduciary duties through multiple acts and omissions, including but not limited to:

    a.    structuring and documenting an investment program that mischaracterized passive investors as "joint venture partners" despite the absence of meaningful managerial authority;

    b.    enabling the solicitation of investor funds through a structure that avoided the regulatory protections of federal and state securities laws;

    c.    issuing or authorizing legal opinions suggesting that the investment structure complied with applicable law despite the economic realities of the transaction;

    d.    failing to disclose material legal and structural risks inherent in the investment program;

    e.    permitting its legal work and reputation to be used as assurances of legitimacy in connection with the solicitation of investor funds; and

    f.    failing to exercise independent professional judgment in evaluating the legality and risks of the enterprise.

119.    Defendant knew or reasonably should have known that its actions would enable Goliath to solicit and obtain substantial capital from investors under the guise of joint venture participation.

120.    Defendant's breaches of fiduciary duty facilitated the operation of an investment scheme that ultimately resulted in the loss of hundreds of millions of dollars contributed by investors.

121.    Defendant's conduct was a direct and proximate cause of the damages suffered by Plaintiffs and members of the Class.

122.    As a result of Defendant's breaches of fiduciary duty, Plaintiffs and the Class suffered substantial financial losses, including the loss of invested capital and other consequential damages.

123.    Plaintiffs and the Class are therefore entitled to recover damages caused by Defendant's breaches of fiduciary duty, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT THREE
## <u>CONSTRUCTIVE FRAUD</u>

124.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–85 as if fully set forth herein.

125.    At all relevant times, Defendant occupied a position of trust and confidence with respect to Plaintiffs and members of the Class by virtue of Defendant's role in structuring and documenting the legal framework governing the Goliath investment enterprise.

126.    As alleged above, Defendant structured, drafted, and validated the Goliath joint venture enterprise, including preparing the JVAs, subscription materials, and related legal documentation governing the investment program.

127.    Through these activities, Defendant provided legal services to the joint venture enterprise and undertook responsibilities that directly affected the rights and interests of the investor-partners participating in the enterprise.

128.    Defendant further knew that its legal work—including the structuring of the JVAs and the issuance of legal opinions regarding the regulatory status of the investment program—

would be relied upon by investors and by financial intermediaries facilitating investor participation.

129.    Defendant therefore knew or reasonably should have known that investors would place trust and confidence in the legal structure and documentation Defendant prepared in determining whether to participate in the investment program.

130.    In the course of structuring and documenting the investment enterprise, Defendant made representations—both express and implied—regarding the legal validity, regulatory compliance, and structural integrity of the joint venture program. These representations arose not only from Defendant's written legal opinions but also from the legal framework and documentation Defendant drafted to govern the investment enterprise.

131.    Defendant also omitted material facts concerning the risks and structural deficiencies inherent in the enterprise.

132.    Among other things, Defendant failed to disclose material information including, but not limited to:

   a.    the substantial risk that the investment program constituted the offer and sale of securities under federal and state law;

   b.    the absence of meaningful managerial control by investor participants despite their designation as "joint venture partners";

   c.    the legal and regulatory risks associated with structuring the enterprise to avoid securities registration and investor protection requirements;

   d.    structural weaknesses that created foreseeable opportunities for the misuse or misappropriation of investor funds; and

   e.    conflicts and risks arising from Defendant's role in facilitating the investment structure while allowing its legal work to be used to assure investors of the enterprise's legitimacy.

133.    These omissions concerned material facts that a reasonable investor would have considered important in deciding whether to participate in the Goliath investment program.

134. Defendant knew or reasonably should have known that investors would rely upon the legal structure and legal opinions it provided when deciding whether to contribute capital.

135. Plaintiffs and members of the Class reasonably relied upon Defendant's structural representations, legal work, and omissions when deciding to invest in the joint venture enterprise. Such reliance was foreseeable and intended because Defendant's legal work defined the investment structure through which investor participation was solicited and governed.

136. Defendant's omissions and structural representations materially misled investors regarding the legality, risks, and regulatory status of the investment program.

137. By virtue of the trust and confidence created by Defendant's role in designing and documenting the investment structure—and the foreseeable reliance of investors on that work—Defendant had a duty to disclose material information necessary to ensure that investors were not misled by the structure and legal documentation it created.

138. Defendant breached that duty by failing to disclose material risks and deficiencies while permitting the enterprise to be presented to investors as a legitimate and compliant joint venture structure.

139. Defendant's conduct constituted an abuse of the position of trust and confidence it occupied with respect to Plaintiffs and the Class.

140. Defendant's actions therefore constitute constructive fraud under applicable law.

141. Defendant's constructive fraud materially misled investors and induced the contribution of substantial capital to the Goliath enterprise.

142. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class suffered substantial financial losses, including the loss of invested capital and other consequential damages.

143.    Plaintiffs and the Class are therefore entitled to recover damages caused by Defendant's constructive fraud, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

144.    WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully request that the Court enter judgment in their favor and grant the following relief:

a.    Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

b.    Enter judgment in favor of Plaintiffs and the Class and against Defendant on all claims asserted herein;

c.    Award compensatory damages in an amount to be determined at trial for all losses suffered by Plaintiffs and members of the Class as a result of Defendant's wrongful conduct;

d.    Award consequential damages, including damages resulting from the loss of investment opportunity and the loss of the use of invested capital;

e.    Order disgorgement and restitution of all fees, compensation, and benefits Defendant received in connection with the structuring, documentation, or validation of the Goliath enterprise;

f.    Impose a constructive trust and order an equitable accounting for any funds, fees, or benefits wrongfully obtained by Defendant in connection with the Goliath enterprise;

g.    Award rescission or rescissory damages to restore Plaintiffs and members of the Class to the financial position they would have occupied absent Defendant's misconduct;

h.    Grant equitable relief as necessary to remedy Defendant's misconduct and to restore Plaintiffs and the Class to the financial position they would have occupied absent Defendant's wrongdoing;

i.    Award pre-judgment and post-judgment interest as permitted by law;

j.    Award Plaintiffs and the Class their reasonable attorneys' fees, litigation costs, and expenses where permitted by law; and

k.      Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

145.    Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted this 5th day of March, 2026 by:

s/ Adam A. Schwartzbaum
**ADAM A. SCHWARTZBAUM, P.A.**
Adam A. Schwartzbaum, Esq.
Fla. Bar No. 93014
14 NE 1st Ave Suite 705
Miami, FL 33132
adam@schwartzbaum.com
Tel: 305-725-1245

s/ Jeffrey R. Sonn
**SONN LAW GROUP**
Jeffrey R. Sonn, Esq.
Fla. Bar No.
19495 Biscayne Blvd.,
Suite 607
Aventura, FL 33180
jsonn@sonnlaw.com
Tel: 305-912-3000

s/ Jordan Shaw
**SHAW LEWENZ**
110 SE 6th Street, Suite 2900
Fort Lauderdale, FL 33301
Jordan A. Shaw, Esq.
Fla. Bar No. 111771
jshaw@shawlewenz.com
Gabriel E. Morales, Esq.
Fla. Bar No. 1038778
gmorales@shawlewenz.com
Tel: 954-361-3633

s/ T. Liam Murphy
**Murphy's Law: The Crypto Law Firm**
T. Liam Murphy, Esq.*
353 Lexington Avenue
4th Floor, Suite 400

New York City, New York 10016
liam@murphyslawcrypto.com
Tel: 913-575-0540
*Pro Hac Vice Application Forthcoming*