**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

JOHN EULIANO, as Trustee of the JOHN D. EULIANO REVOCABLE TRUST UTD 5-27-14; BREVARD NURSING ACADEMY, LLC D/B/A COASTAL TECHNICAL INSTITUTE; COLE BRANTLEY; CGB LOIS T, LLC; LUCREZIA PRESTA; PRESTA LLC; ROBBY A. STEELE; BRIAN J. BAILEY; ERIC LOGWOOD, as Trustee of the LITA LIVING TRUST DTD 8-19-24; and JP POLITANO, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ALSTON & BIRD, LLP; BROAD FINANCIAL, LLC; BANK OF AMERICA, N.A.; JPMORGAN CHASE BANK, N.A.; and COINBASE GLOBAL, INC.,

Defendants.

**CASE NO. 26-60646-CIV-DAMIAN**

CLASS ACTION

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs John Euliano, as Trustee of the John D. Euliano Revocable Trust UTD 5-27-14 (“Euliano Trust”); Brevard Nursing Academy, LLC d/b/a Coastal Technical Institute (“CTI”); Cole Brantley; CGB Lois T, LLC (“CGB”); Lucrezia Presta; Presta LLC; Robby A. Steele; Brian J. Bailey; Eric Logwood, as Trustee of the Trustee of the Lita Living Trust DTD 8-19-24; and JP Politano (collectively “Plaintiffs”), by and through undersigned counsel, bring this action against Defendants Alston & Bird LLP (“Alston & Bird”); Broad Financial, LLC (“Broad Financial”); Bank of America, N.A. (“Bank of America”); JPMorgan Chase Bank, N.A. (“JPMorgan Chase”); and Coinbase Global, Inc. (“Coinbase”) (collectively “Defendants”), and allege as follows:

## NATURE OF THE ACTION

1. For the past several years, Christopher Delgado and his company, Goliath Ventures, Inc., offered investors the opportunity to receive safe and stable returns from cryptocurrency liquidity pools. The pitch was that investors' funds would be contributed to collections of cryptocurrency that provide asset liquidity to traders on certain exchanges. Investors would not need to do much other than send money to Goliath. Goliath told investors that they would receive guaranteed monthly returns of between 3-8% as well as a guarantee that their principal investment would be preserved.

2. Goliath's marketing campaign and referral network were successful. Over a three-year period, the company collected approximately $328 million from investors across various states and in Canada. Until recently, investors were receiving the monthly returns that Goliath promised them, and some investors were able to withdraw their principal from the company.

3. When Delgado was arrested by federal authorities and charged with wire fraud and money laundering in February 2026, however, it quickly became apparent that he had actually been running a Ponzi scheme. Instead of placing investors' money in liquidity pools, Delgado kept nearly all of it in the company's traditional bank accounts and cryptocurrency wallets. He used investor money to fund lavish personal and corporate expenses, and to pay purported returns to existing investors.

4. Plaintiffs, on behalf of themselves and other investors like them, seek to hold Defendants accountable for their role in facilitating Delgado's fraudulent scheme.

**A. Alston & Bird**

5. Goliath could not have gotten away with this massive fraud without the help of its law firm, Alston & Bird. Defendant Alston & Bird is one of the largest law firms in the United States. In most instances, its reputation precedes it.

6. Delgado started the Goliath enterprise in or around 2023, signing up investors through joint venture agreements ("JVAs") drafted before Alston & Bird's involvement. Later, in 2025, Alston & Bird was hired by Delgado to redo the agreements with investors who were already joint venturers, to assure that all investors were subject to identical JVAs. Alston & Bird inherited a joint venture with hundreds, if not thousands of joint venture "partners," to whom it immediately owed legal and fiduciary duties. Regardless of who ultimately signed Alston & Bird's retainer agreement, Alston & Bird was retained to provide legal services to the joint venture, including Plaintiffs and all Class members.

7. In structuring and legally endorsing the Goliath joint venture enterprise, Alston & Bird abandoned the very duties that give its reputation value. It drafted the governing JVAs, engineered the legal architecture through which investor funds, including retirement funds, were solicited and transferred, and issued legal assurances intended to induce reliance by investors and custodial institutions. Alston & Bird enabled the structure that caused investors to commit millions of dollars to a fatally defective enterprise—losses that were foreseeable, preventable, and directly traceable to the legal framework it designed.

8. Alston & Bird designed the legal framework through which investor funds and retirement funds were solicited, pooled, transferred, and deployed. Alston & Bird drafted a key legal Opinion Letter which Goliath and its principals used to justify its representation that its

enterprise was legitimate and was not subject to the securities laws when, in fact, it was illegitimate and unavoidably subject to securities regulations.

9. Further, the JVAs drafted by Alston & Bird created Florida joint ventures—partnerships under Florida law—thereby making Alston & Bird not only legal counsel to Goliath and its principals, but also to each one of the joint venturers. Indeed, as worded, Goliath itself was the "joint venture" and the JVA defined each investor as a "Partner"—using the term "Partner" when referring to Plaintiffs 96 times in each JVA. The JVAs also established fiduciary obligations running to those partner-investors.

10. In general, Alston & Bird created and Goliath deployed two separate but related scams: The first, a general investment pool, whereby investors would provide fiat currency or digital currency to Goliath for investment into liquidity pools, in exchange for monthly returns based upon trading in the pool—a security under *S.E.C. v. W.J. Howey Co.* if there ever was one (the "LP Scam"). The second, a program where Goliath would facilitate the creation and management of a self-directed independent retirement account or IRA, whereby it solicited and purported to invest funds into Goliath through the investors' IRA ("IRA Scam"). Importantly, both the LP Scam and the IRA Scam could not have happened without the JVAs.

11. Alston & Bird knew that retirement investors lacked access to internal information and would rely upon the integrity and independence of legal counsel structuring the enterprise. Despite this, Alston & Bird facilitated a structure riddled with conflicts, opacity, and foreseeable risk, while permitting investor-facing reliance upon its legal work product.

12. As a direct and proximate result, investors suffered catastrophic financial losses. Accordingly, Plaintiffs bring this class action lawsuit to hold Alston & Bird accountable for its legal malpractice, breaches of fiduciary duty, and constructive fraud.

**B. Broad Financial**

13. Broad Financial was the steering wheel for Goliath—guiding investors towards financial ruin without regard to Broad Financial's own representations, its duties, or the law. Broad Financial was the "gatekeeper" and facilitator who built and profited from the pipeline that made it easy—and fast—for retirement funds to be converted into fuel for Goliath's Ponzi scheme. Through Broad Financial's pipeline, retirement investors could rapidly move Individual Retirement Account (IRA) funds to an IRA-owned LLC and then, with minimal friction, wire or transfer those retirement funds into Goliath's Ponzi scheme. Broad Financial processed a concentrated stream of investors referred by Goliath promoters who were all directed to invest in the same purported joint venture structure using identical offering materials and substantially identical transaction mechanics.

14. Broad Financial processed at least dozens of Goliath-referred investors through the same intake, charged them the same fees, handed them the same defective documents, and sent them down the same path to financial ruin, all while collecting its fee and calling itself a sanctuary. Broad Financial is therefore liable for negligence, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and violations of New Jersey law.

**C. JPMorgan Chase and Bank of America**

15. JPMorgan Chase and Bank of America had unique insight into Goliath's operations and the true nature of what it was doing with investors' money. After investors' funds were deposited into Goliath's traditional bank accounts at JPMorgan Chase and at Bank of America, Delgado used his accounts at these banks to pay supposed returns to existing investors and to support his lifestyle. But rather than expose Delgado's fraudulent business, JPMorgan Chase and

Bank of America chose to profit from it. JPMorgan Chase and Bank of America are liable for aiding and abetting fraud and breach of fiduciary duty.

**D. Coinbase**

16. Coinbase played a vital role in the operation of that scheme. Between 2023 and 2025, more than $165 million in investor funds were transmitted to accounts maintained at Coinbase in the name of Goliath. Coinbase provided the platform through which those funds were converted into cryptocurrency and then transferred to external wallets controlled by Goliath's principals and wallets controlled by many of Goliath's victims.

17. The transaction activity observable within Coinbase's systems was inconsistent with the business model that Goliath represented to investors. Goliath claimed that investor funds would be deployed into cryptocurrency trading strategies and liquidity pools. If that were accurate, Coinbase would have observed corresponding activity, including sustained trading, interaction with liquidity protocols, and inflows reflecting trading profits.

18. No such activity occurred. The transaction activity within Coinbase's platform included the rapid conversion of investor funds into digital assets followed by transfers to external wallets and did not reflect profitable trading activity. Of the approximately $165 million transmitted through Coinbase, only a small fraction—approximately $1.5 million—was deployed into actual liquidity pools, while the remainder was diverted.

19. Coinbase, as a regulated financial intermediary, is required to maintain systems designed to monitor customer activity, understand the nature and purpose of accounts, and identify transactions inconsistent with expected use. Those obligations define the information Coinbase was required to obtain, monitor, and evaluate in connection with account activity conducted on its platform. Coinbase has publicly acknowledged that cryptocurrency platforms are susceptible to

fraud, money laundering, and misuse of customer funds, and that it maintains systems designed to detect and prevent such activity.

20. Despite seeing indicators of Goliath's fraud, Coinbase continued to process and execute transactions on behalf of Goliath, thereby providing the infrastructure through which the scheme operated. Coinbase is liable for aiding and abetting fraud and breach of fiduciary duty.

## JURISDICTION AND VENUE

21. This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

22. The Court has specific personal jurisdiction over Defendants because Plaintiffs' claims arise out of and relates to Defendants' unlawful conduct in Florida.

23. Venue is proper under 28 U.S.C. § 1391(b)(2) in this District because this District is where substantial events giving rise to the claims occurred.

## PARTIES

24. Plaintiff John Euliano is an individual who resides in Winter Springs, Florida. Euliano is the trustee of the John D. Euliano Revocable Trust UTD 5-27-14.

25. Plaintiff Brevard Nursing Academy, LLC is a Florida limited liability company with its principal place of business in Palm Bay, Florida. Brevard Nursing Academy, LLC currently does business as Coastal Technical Institute and is referred to herein as "CTI".

26. Plaintiff Cole Brantley is an individual who resides in Tampa, Florida.

27. Plaintiff CGB Lois T, LLC, is a Florida limited liability company organized with its principal place of business in Lakeland, Florida.

28. Plaintiff Lucrezia Presta is an individual who resides in Stanley, North Carolina.

29. Plaintiff Presta LLC is a North Carolina limited liability company with its principal place of business in Stanley, North Carolina.

30. Plaintiff Robby A. Steele is an individual who resides in Los Angeles, California.

31. Plaintiff Brian J. Bailey is an individual who resides in Santa Clara, California.

32. Plaintiff Eric Logwood is an individual who resides in Las Vegas, Nevada. Logwood is the Trustee of the Lita Living Trust DTD 8-19-24 (the "Lita Trust").

33. Plaintiff JP Politano is an individual who resides in Deltona, Florida.

34. Defendant Alston & Bird LLP is a limited liability partnership organized under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia.

35. Defendant Broad Financial LLC is a limited liability company organized under the laws of the State of New Jersey with its principal place of business located in Montvale, New Jersey.

36. Defendant JPMorgan Chase, N.A., is a Delaware corporation with its principal place of business in Columbus, Ohio.

37. Defendant Bank of America, N.A., is a Delaware corporation with its principal place of business in Charlotte, North Carolina.

38. Defendant Coinbase Global, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

## FACTUAL ALLEGATIONS

### I. Delgado Operated Goliath Ventures as a Ponzi Scheme.

39. Delgado established Goliath in 2019. He initially called it Gen-Z Venture Firm but changed its name to Goliath in 2021. Delgado served as the president and chief executive officer of the company.

40. Goliath marketed itself as a private fund that invested in blockchain and cryptocurrency projects. The company employed associates to solicit investors through presentations and marketing materials.

41. As part of Goliath's scheme, Goliath also implemented a purported IRA, whereby investors were induced to transfer their years-earned IRA balances to a self-directed IRA (SDIRA) supposedly affiliated with Goliath, so that investors could place those IRA funds into Goliath's scheme. The Goliath investments were evidenced by JVAs between the investor and Goliath.

42. Delgado and his associates also told potential investors that their money would be placed in liquidity pools, where it would earn passive income. A liquidity pool is a collection of cryptocurrencies held in a smart contract, or a digital agreement stored on a blockchain network. The purpose of a liquidity pool is to facilitate trades of cryptocurrency on a decentralized exchange. Those who deposit into a liquidity pool typically receive a portion of transaction fees or other incentives generated by trading activity within the pool.

43. Delgado and Goliath made specific representations to investors about how the company would use their funds. They told investors that their money would move from a traditional bank account in Goliath's name to Coinbase, then to an encrypted ledger, and then to liquidity pools that would generate returns for them. The liquidity pools would run on one or more

exchanges, such as Uniswap. Goliath included the below illustration of this investment cycle in its marketing materials:




44. Individuals could become investors by entering JVAs with Goliath. Under Florida law, the JVAs created joint ventures, or partnerships, where each investor was a partner and joint venturer. Under the JVAs, Goliath represented that "partner" funds would be deployed into liquidity pools and distribute returns on investments. Through the joint venture agreement, investors also gave Goliath sole discretion to make investment decisions on their behalf, including the discretion to change investment methods. Goliath's discretion could be based on market conditions, or on its own opinion that a different investment approach is more suitable for investors' money.

45. Goliath also sometimes guaranteed monthly returns ranging from 3–8% as well as the return of an investor's principal. Goliath gave investors the option to withdraw their monthly returns or "roll over" monthly returns, which would increase their account balances.

46. Goliath's marketing materials described its investment strategy as one that entailed active monitoring and risk management. They mentioned risk management tools such as stop-loss mechanisms, slippage monitoring, and centralized exchange hedging.

47. Goliath and Delgado's pitch was successful. Between January 2023 and January 2026, Goliath raised at least $328 million from investors. Investors resided across the country, including in Florida, California, New York, and Nevada, and internationally, including in Canada.

48. Delgado and Goliath became well-known in their community. Delgado was named as one of the "20 Entrepreneurs Who Are Building Empires in 2023" by USA Today. Goliath served as the title sponsor of The Vault in 2025, a widely known annual conference for company founders and business leaders. Goliath also advertised its purported donations of over $500,000 to local charities in 2023 and another $1 million in 2024 and 2025.

49. The problem for investors is that the representations Goliath made in its marketing materials, joint venture agreements, and online portal were false. Investors entrusted Goliath and Delgado with their money. Goliath and Delgado, for their part, took control over investors' funds and promised to invest it safely in liquidity pools. But, instead of placing investor funds in liquidity pools, Delgado was using nearly all those funds to pay for his lavish lifestyle and—in classic Ponzi-like fashion—using new investor funds to pay previous investors. Of the over $300 million Delgado and Goliath obtained from investors from January 2023 through January 2026, only $1.5 million was actually deposited into a liquidity pool.

50. The reporting that Goliath provided to investors in its online portal was fraudulent. Goliath provided investors with monthly statements and, beginning in or around August 2025, with access to an online account portal that supposedly displayed real-time account activity, including

an investor's principal and amount of returns. The statements and portal showed the promised monthly gains for each investor.

51. While the amount of principal investments that the portal displayed were accurate, the reported returns (displayed as "Monthly Distribution Rates" and "Monthly Distribution Balances") were not generated from a liquidity pool or any investment activity. Goliath falsified the rate of return displayed for each investor to match the rate of return that it promised to him.

52. Over $300 million in investor money was deposited in Goliath's traditional bank accounts at JPMorgan Chase and Bank of America, and over $60 million in original investor funds were deposited in its cryptocurrency wallets at Coinbase (where Goliath let it sit instead of placing it in liquidity pools). This $60 million that investors deposited directly into Coinbase wallets is distinct from the investment funds that Goliath transferred to Coinbase from its traditional bank accounts.

53. The Goliath fraud started unfolding in late 2025, when the company began delaying payments to investors. Goliath and Delgado provided varying excuses for the delays, such as audits and compliance issues, while assuring investors that payments would resume in short order. Around the same time, Goliath denied several investors' requests for a return of their principal.

54. On February 24, 2026, Delgado was arrested and charged with money laundering and wire fraud in connection with the operation of Goliath. Since then, all payments to investors have been suspended, investors have been unable to access Goliath's mobile application, and questions about where their investments stand have gone unanswered.

## II. Alston & Bird Played an Essential Role in the Ponzi Scheme.

55. Prior to the formation of Goliath's purported "liquidity pool," Christopher Delgado had encountered regulatory and business difficulties in connection with prior ventures, including disputes involving a prior venture known as "Liquidity Partners."

56. Delgado represented that he intended to do things the right way going forward. In practice, however, what he sought was not compliance with federal and state securities laws, but a mechanism to avoid them—particularly the investor accreditation requirements, disclosure obligations, registration burdens, and compliance oversight that would otherwise apply to the capital-raising activities he planned to undertake.

57. Delgado retained Alston & Bird to structure the enterprise and provide legal cover for the planned capital raise. Delgado and his agents communicated to Alston & Bird that he did not wish to limit fundraising to accredited investors or comply with the regulatory framework attendant to the offer and sale of securities. He did not want to make the required—protective—disclosures and did not. Instead, he sought an opinion that would permit Goliath to solicit funds broadly from individuals and entities—including retirement funds through self-directed IRAs—without complying with securities registration, exemption, disclosure, or accreditation requirements.

58. Alston & Bird agreed to prepare an Opinion Letter addressing whether the proposed "liquidity pool" structure constituted a security. Despite the economic, structural, and practical realities of the contemplated transactions and returns, the Opinion Letter concluded that the structure would not implicate federal securities laws.

59. Specifically, the Opinion Letter provided that Delgado and Goliath could raise capital from investors and channel those funds into a pooled enterprise through purported "joint

venture agreements" without triggering the regulatory obligations applicable to the offer and sale of securities.

60. In short, Alston & Bird made every investor a "Partner"—thereby creating duties owed to them—while simultaneously stripping those same "Partners" of the legal and regulatory protections that would normally apply to their investment. The firm did so without any disclosure in the JVAs and without the conflict disclosures required when counsel for a joint venture takes actions adverse to some of its partners.

61. Alston & Bird created the platform for Delgado to use Goliath to defraud hundreds of innocent people to whom Alston & Bird also owed a duty. They created the partnership and allowed Delgado and Goliath to destroy the investor partners.

62. Alston & Bird knew or, at a minimum, should have known that the substance of the liquidity pool arrangement bore the hallmarks of an investment contract under well-established federal law. Under the economic-realities framework articulated in *SEC v. W.J. Howey Co.*, an instrument constitutes a security where there is an investment of money in a common enterprise with an expectation of profits derived from the efforts of others.

63. Even more fundamentally, Alston & Bird rendered legal advice to a Florida corporation with a principal place of business in Florida. In Florida, a security includes, "[a]n investment contract," "[a] beneficial interest in title to property, profits, or earnings" and/or "[a]n interest in or under a profit-sharing or participation agreement or scheme."

64. The Goliath structure involved precisely that: participants invested capital into a centralized liquidity pool; funds were commingled; profits were promised based on the enterprise's trading and lending strategies; and all meaningful managerial and operational control rested exclusively with Delgado and his team. The mere labeling of participants as "joint venturers" or

"partners" did not alter the economic substance of the transaction. What it did do, however, was trigger a duty owed by Alston & Bird to the partners or joint venturers in the joint venture it created and represented, and then facilitate securities fraud and other misconduct on behalf of one partner against the rest.

65. The Opinion Letter authored by Alston & Bird relied heavily on the formalistic use of JVAs to characterize each participant as a "partner" rather than an investor. The JVAs repeatedly referred to capital contributors as "partners" and purported to grant them joint venture status. In reality, however, the agreements conferred no meaningful managerial control, voting authority, or operational participation to the capital contributors. Participants functioned as passive investors whose returns depended entirely on Delgado's efforts. As such, the arrangement satisfied the functional elements of an investment contract notwithstanding its nomenclature. What it did confer, however and as noted above, was a reasonable expectation by those "Partners" that the joint venture's lawyer, Goliath's lawyer, Alston & Bird would fulfill the duties owed to a partnership. It did not.

66. Of course, joint ventures ordinarily come in two forms. The first, where no entity is formed and two parties join for a common purpose—good lawyers seek to avoid general partnership implications in this scenario. This is often called an "alliance." The other is where a more formal entity is formed and the parties are "partners."

67. Here, Alston & Bird created a joint venture with no entity—an alliance—except Alston & Bird also treated and in fact defined the investors as "Partners," not joint venturers, to avoid the securities laws. However, for taxation purposes, each "Partner" received a 1099 for profits not a K1, it was not treated as a partnership.

68. The JVA also alludes to the fact that Goliath itself is the joint venture. Alston & Bird tried to thread a needle with no eye.

69. In addition, it is nearly impossible to have a true joint venture for a liquidity pool investment which requires one party to invest money and the other to manage the money and do all the work. Indeed, in section 4.3 of the JVA, Goliath retained the ability to control "Partner" investments, methods, or operation in its sole discretion.

70. Alston & Bird's structuring advice and opinion were not neutral academic exercises. The firm understood—or purported to understand—that a conclusion that the arrangement constituted a security would have required Goliath to either register the offering or strictly comply with exemptions that would significantly limit the pool of eligible investors and impose robust disclosure and compliance obligations.

71. By opining that the structure fell outside the securities laws, Alston & Bird enabled Goliath to solicit funds broadly, including retirement assets through self-directed IRAs, without providing the protections mandated by federal and state securities regimes. It also provided an air of legitimacy to an otherwise illegitimate structure.

72. The scheme engineered and endorsed by Alston & Bird was advantageous to Delgado and Goliath because it removed regulatory guardrails and expanded the universe of potential investors. It was likewise beneficial to Alston & Bird in that it preserved and expanded its professional engagement with Goliath. It was catastrophic, however, to the individuals induced to contribute capital under the guise of joint venture participation. Operating outside the securities-law framework deprived investors of disclosure protections, regulatory oversight, and structural safeguards designed to prevent precisely the type of misconduct that followed. While it greatly benefited some of the partners in the joint venture, it destroyed the lives and livelihoods of others.

73. In substance, the JVAs created a pooled enterprise in which investors contributed at least $328 million in capital that was managed exclusively by Delgado and Goliath. By eschewing the securities-law framework, Goliath was able to operate without transparency, independent oversight, or mandated reporting, ultimately facilitating a massive Ponzi scheme that resulted in catastrophic losses to participants.

74. As noted throughout, under the terms of the JVAs, each capital contributor was denominated a "Partner" in the enterprise with Goliath. To the extent the structure created a partnership or joint venture under applicable law, the duties owed by counsel to the joint venture enterprise extended to its partners. Alston & Bird undertook to structure and document the enterprise itself and to render legal opinions integral to its formation and capital-raising activities. In doing so, and particularly where its opinions were intended to induce investor and IRA-custodian reliance, Alston & Bird assumed duties not only to Delgado's corporate vehicle but also to the joint venture and its partners.

75. Alston & Bird failed to disclose material conflicts of interest, structural weaknesses, and foreseeable risks inherent in the design of the Goliath investment program.

76. By designing and documenting the investment structure while permitting investors and financial intermediaries to rely upon its legal work, Alston & Bird enabled a capital-raising scheme that ultimately resulted in hundreds of millions of dollars in investor losses.

77. As a direct and proximate result of Alston & Bird's breaches of duty—including but not limited to negligent and/or knowingly improper legal opinions, structuring advice designed to circumvent securities protections, and the failure to recognize or disclose the securities-law implications of the arrangement—Plaintiffs and members of the Class were exposed to an unlawful and unsupervised capital-raising scheme. That exposure resulted in the loss of at least $328 million

in invested funds, including substantial retirement savings placed at risk through self-directed IRA structures.

78. But for Alston & Bird's opinion and structuring advice, the Goliath liquidity pool could not have been marketed and sold in the manner it was. The firm's conduct was a substantial factor in enabling the scheme to proceed and in causing the damages suffered by Plaintiffs and the Class.

**III. Broad Financial Facilitated the Ponzi Scheme.**

79. Broad Financial markets and sells SDIRA and checkbook-control setup services to investors who sought to use retirement funds for specific alternative-asset investments.

80. They are, in a nutshell, a middleman that uniformly misrepresents itself as having expertise and offering advice they respectively do not have and cannot offer.

81. The SDIRA ecosystem can allow alternative investments. But it also creates a known and foreseeable vulnerability: it enables promoters to access retirement funds through "checkbook control" structures that can move money quickly.

82. In no uncertain terms, Broad Financial uniformly represents that they review and consider investments, and guide investors to the right Broad Financial plan for the consumer's specific investment:

> We will guide you through the process of selecting from our variety of Self-Directed IRA services to pick the right plan for your investment and get everything up and running so you can start investing.

83. In fact, Broad Financial's public-facing onboarding is investment-specific. Its intake flow asks prospective customers, "What would you like to invest in?"

84. This makes sense. Because, of course, if Broad Financial did not review the investment it could not, as it purports to do, guide its clients to the "right plan."

85. Undoubtedly, Broad Financial will claim that it did not, in fact review the investment, which is equally problematic considering Broad Financial's promise that it would "guide" investors to "pick the right plan for [their] investment."

**A. SDIRAs, Checkbook Control Structures, and the Role of Broad Financial**

86. A traditional IRA is a tax-advantaged retirement savings vehicle held by a custodian—typically a bank or brokerage—that limits investment options to conventional assets such as stocks, bonds, and mutual funds. The custodian serves as a check on the IRA owner's investment decisions, reviewing transactions, maintaining records, and helping ensure the IRA complies with applicable tax law.

87. A SDIRA is a variation of the traditional IRA that permits the account owner to invest in a broader range of "alternative assets," including real estate, private equity, precious metals, and cryptocurrency. Like a traditional IRA, a SDIRA must be held by a qualified custodian. Unlike a traditional IRA, the SDIRA custodian typically takes a passive role —it holds the assets and processes transactions as directed by the IRA owner but does not evaluate or approve the merits of the investments the owner chooses to make.

88. Because SDIRA custodians must sign off on each transaction, some investors seek an additional layer of structural control known as "checkbook control." In a checkbook control arrangement, the SDIRA custodian contributes the IRA's funds into a limited liability company ("LLC") that the IRA owns. The IRA owner is then named manager of the IRA-owned LLC. Because the IRA owner controls the LLC as its manager, the IRA owner can write checks or wire funds directly from the LLC's bank account to make investments—without requiring the custodian's involvement in each transaction. The structure looks like this:

IRA Owner (as Manager)
↓
SDIRA (held by Custodian)
↓
owns 100% IRA-Owned LLC
↓
Investments

89. The checkbook control structure offers legitimate advantages for experienced investors in appropriate circumstances—primarily speed of execution and reduced per-transaction custodian fees. But it also dramatically reduces custodian oversight, placing the full burden of legal and tax compliance on the IRA owner. Because the IRA owner is writing the checks directly, there is no custodian review to catch mistakes—or fraud.

90. The legal risks of a checkbook control structure are significant and well-documented. The IRA is a separate, tax-exempt entity. Federal law requires it to be treated as entirely distinct from the IRA owner's personal finances and business interests. Despite the name, the IRA owner is a fiduciary with respect to the IRA's assets—not an owner. The IRA owner cannot personally benefit from IRA assets, cannot use IRA property, cannot pay himself fees for managing the IRA's investments, and cannot transact with "disqualified persons," a defined category that includes the IRA owner, the owner's spouse, lineal descendants, and any entity in which the owner holds a controlling interest.

91. These restrictions are codified at 26 U.S.C. § 4975, which defines "prohibited transactions" and imposes severe consequences for violations. If an IRA owner engages in a prohibited transaction, the IRA ceases to be an IRA as of the first day of that taxable year — meaning the entire account balance is treated as distributed, triggering immediate income tax and, for owners under 59½, a 10% early withdrawal penalty. In other words, a single prohibited

transaction can instantly convert a lifetime of tax-advantaged retirement savings into a fully taxable distribution.

92. One of the most common and most dangerous prohibited transaction traps in the checkbook control context involves partnership or joint venture investments in which the IRA owner holds a significant interest. Under 26 U.S.C. § 4975(e)(2)(G), a partnership or joint venture in which the IRA owner—who is a fiduciary and therefore a "disqualified person"—owns 50% or more of the capital or profits interest is itself a disqualified person. Any transaction between the IRA and a disqualified person is prohibited. Accordingly, where an IRA owner causes the IRA-owned LLC to invest in a joint venture in which the owner holds a 50% or greater interest, the investment creates an automatic prohibited transaction, with potentially catastrophic tax consequences for the IRA owner.

93. Because of these risks, checkbook control structures are not appropriate for every investor or every investment. They require careful structuring, independent legal and tax advice, and rigorous ongoing compliance. The IRA owner must understand not only the mechanics of the LLC but the specific legal limitations on how IRA assets may be used—limitations that are technical, counterintuitive, and easy to violate without expert guidance.

94. This is precisely where companies like Broad Financial insert themselves into the market. Broad Financial calls itself a "facilitator:" "As an IRA LLC Facilitator, Broad Financial upgrades your Self-Directed IRA with the power of checkbook control." Broad Financial markets and sells the formation and setup of SDIRA/checkbook control structures to retail investors—who are not tax lawyers or securities professionals, who are entrusting their life savings to a structure they do not fully understand, and who are relying on Broad Financial's self-advertised expertise to

guide them safely through it. As set forth below, Broad Financial exploited that reliance, collected its fees, and delivered not guidance but a ready-made vehicle for financial ruin.

### B. Federal Regulators Have Long Warned that SDIRAs are Frequently Used in Fraud Schemes

95. The risks associated with SDIRAs being used to facilitate fraudulent investment schemes are well known and have been repeatedly highlighted by federal regulators for many years prior to the events alleged herein.

96. The SEC has issued formal public warnings explaining that SDIRAs are frequently exploited by fraud promoters to access retirement savings and to lend legitimacy to otherwise fraudulent investment schemes.

97. In its Investor Alert entitled "Self-Directed IRAs and the Risk of Fraud," the SEC warned investors that promoters of Ponzi schemes and other fraudulent investments often encourage victims to use SDIRAs to invest retirement funds in alternative assets, including private placements and cryptocurrency ventures.

98. The SEC further warned that SDIRA custodians and administrators frequently perform only ministerial functions and typically do not evaluate the legitimacy of the investments held within the account, creating an environment in which fraudulent promoters can misuse the structure to obtain retirement funds from unsuspecting investors.

99. The SEC specifically cautioned that fraudsters may attempt to create the appearance of legitimacy by directing investors to open SDIRAs and invest through specialized retirement-account structures, thereby giving the false impression that the investment has been vetted or approved by financial professionals.

100. The Financial Industry Regulatory Authority (FINRA) has likewise issued Investor Alerts warning that SDIRAs are frequently used to facilitate fraudulent schemes involving private placements, cryptocurrency ventures, and other alternative investments.

101. In its Investor Alert entitled "Self-Directed IRAs and Fraud," FINRA warned that promoters of fraudulent investments often encourage investors to transfer retirement savings into SDIRAs so that the promoters can gain access to those funds through alternative-asset investments that are not subject to the same oversight or vetting present in traditional retirement accounts.

102. FINRA further warned that the structure of SDIRAs can create a heightened risk of fraud because investors often mistakenly believe that the existence of a custodian or facilitator implies that the investment has been evaluated for legitimacy or compliance when, in reality, no such review has occurred.

103. The Internal Revenue Service ("IRS") has also issued public warnings explaining that SDIRA structures—particularly those involving so-called "checkbook control" LLCs—present significant legal and compliance risks and have been used in abusive arrangements involving improper or unlawful transactions.

104. The IRS has warned that arrangements involving IRA-owned LLCs and checkbook-control structures can create significant risks of prohibited transactions under 26 U.S.C. § 4975, including situations where the IRA owner participates in a joint venture, partnership, or business arrangement in a manner that benefits the IRA owner personally or involves disqualified persons.

105. The IRS has specifically cautioned that IRA owners who improperly use checkbook-control structures may trigger a prohibited transaction that causes the entire IRA to lose

its tax-advantaged status, resulting in immediate taxation of the full account balance and additional penalties.

106. These warnings were widely disseminated and well known within the SDIRA industry long before the events described in this Complaint.

107. Companies that market and sell SDIRA structures—including companies that form IRA-owned LLCs and promote checkbook-control arrangements—understand such structures can be exploited by fraud promoters to access retirement savings.

108. Accordingly, companies operating in the SDIRA industry are expected to recognize and guard against the well-documented risk that promoters will attempt to use SDIRA structures to facilitate fraudulent investment schemes.

109. Despite these well-known risks and the repeated warnings issued by federal regulators, Broad Financial failed to implement reasonable safeguards designed to prevent its SDIRA structures from being used to facilitate fraudulent investment schemes such as the Goliath enterprise.

110. Instead, Broad Financial processed numerous Goliath-referred investors through the same SDIRA onboarding process and created IRA-owned LLC structures that were used to transfer retirement funds into the Goliath Ponzi scheme.

111. Broad Financial's conduct occurred in an industry environment in which regulators had repeatedly warned that SDIRAs were being used as conduits for fraud and that promoters frequently directed investors to use SDIRA structures to invest retirement savings in fraudulent schemes.

112. By ignoring these well-known regulatory warnings and facilitating the transfer of retirement funds into the Goliath scheme through the structures it created, Broad Financial substantially assisted the operation of the Ponzi scheme described here.

### C. Broad Financial Broadens the Ponzi Scheme and Plays Lawyer along the Way

113. In its haste to generate fees, Broad Financial began working with promoters from Goliath seeking to exploit the life savings and livelihoods of Goliath's investors. Broad Financial employees communicated directly with promoters from Goliath. In broad terms, Broad Financial is a promoter, marketer and advisor on the structure and formation of Self-Directed IRA investments and its sister company, Madison Trust, serves as the SDIRA Custodian. E. Brian Finkelstein is the Chairman of both companies, and both companies appear on their websites to have the same team of executives for both companies.

114. The Goliath promoters, who also stood to gain from investments into Goliath, sent dozens and dozens of unsuspecting individuals to Broad Financial all for the same purpose: to get the investor money into Goliath. Broad Financial maintained a referral fee program pursuant to which it paid approximately $200 per investor to promoters associated with Goliath in exchange for directing investors to Broad Financial to establish self-directed IRA and IRA-owned LLC structures. Through this arrangement, Broad Financial received a concentrated and repeated stream of Goliath-referred investors who were directed to participate in the same investment program using substantially identical transaction structures and materials. This referral-fee arrangement created a direct financial incentive for Broad Financial to process such investors without regard to the legitimacy, suitability, or legality of the underlying investment. By compensating promoters for referrals, Broad Financial was not acting as a neutral service provider but as a participant in the investor-acquisition pipeline that enabled Goliath's scheme to access retirement funds. These

payments further demonstrate that Broad Financial knew, or was willfully blind to the fact, that its services were being used in connection with a coordinated and repetitive investment program, and that it provided substantial assistance to that program by facilitating the formation and funding of investor accounts.

115. Broad Financial was more than happy to accept these referrals, fees, and instructions from these Goliath affiliates and in doing so abandoned its duties and responsibilities to its actual clients. Broad Financial earned formation and service fees from each Goliath-referred investor, creating a direct financial incentive to process the investments without scrutiny.

116. Indeed, Broad Financial did not guide investors to the "the right plan for [their] investment." Broad Financial steered those investors into Goliath's scheme—irrespective of whether there was a right plan to be had. Broad Financial marketed to investors, the "Ultimate IRA LLC®" product and provided a "binder" of entity formation documents and instructions for the IRA LLC.

117. More specifically, in 2025, Broad Financial "guided" investors to its SDIRA Program.

118. In doing so, Broad Financial created (and charged to create) a limited liability company for each investor which would serve as the checkbook-control entity through which their retirement funds would be invested. Though not a law firm, Broad Financial also drafted the operating agreements for the entities so that investors could invest their retirement into a cryptocurrency Ponzi scheme.

119. This is problematic for several reasons outlined further below. Broad Financial is organized under the laws of New Jersey, operates from its principal place of business in Montvale, New Jersey, and performed all its services from that location. Under New Jersey law, New Jersey

Court Rule 1:21-1 provides that no person may practice law in New Jersey unless licensed. The New Jersey Unauthorized Practice of Law Committee has further stated that preparing operating agreements and similar legal documents is the practice of law and may only be performed by lawyers, while nonlawyers may not advise customers concerning the contents of formation documents.

120. Investors had no idea they were wiring funds to a Ponzi scheme, nor did they have any idea that Broad Financial was offering advice that it was in fact prohibited from providing.

121. Broad Financial uniformly represented to the public that it was a "Crypto Sanctuary" and possessed "Alternative Asset Expertise." Through standardized website content and marketing materials, Broad Financial held itself out as having specialized knowledge and experience in alternative investments, including by stating: "Broad Financial Onboarding Specialists have experience with an extensive range of asset classes." These representations were material because a reasonable consumer would consider it important that the entity structuring retirement-account investments possessed expertise regarding those investments. Broad Financial made these representations to induce investors to rely on its purported expertise in selecting and structuring investment vehicles.

122. Before Broad Financial formed an IRA-owned entity for Goliath investors and before Broad Financial drafted or supplied the governing operating agreement for that entity, Broad Financial knew that the purported purpose of the structure was to invest retirement funds into a joint venture in which investors would hold a partner interest and were supposed to have significant control over the enterprise. In other words, Broad Financial never should have allowed investors to invest in these joint ventures through SIDRAs.

123. Broad Financial represented that it would and in fact agreed to "guide" its investors to the "right" retirement investment structure that best suited its investment. It did not.

124. Indeed, Broad Financial represented to investors that it would help them "pick the right plan for your investment," would give an "honest opinion" whether the planned investment would work with the self-directed platform, would create the LLC with a "compliant operating agreement," and would establish the IRA LLC or trust and handle the paperwork.

125. Broad Financial knew the identity and basic structure of the contemplated transaction before selling the Broad Financial-sponsored structure.

126. Broad Financial then formed or caused the formation of the IRA-owned LLC or trust.

127. Worse, Broad Financial prepared or supplied the operating agreement and related organizational papers and instructed investors how to proceed so that retirement funds could be moved into the Broad Financial-created structure.

128. Broad Financial thus did not act as a merely ministerial form vendor; it held itself out as providing investment-specific structural and legal guidance and document preparation for the very transaction Plaintiffs disclosed.

129. Broad Financial processed a concentrated stream of investors referred by Goliath promoters who were directed to make the same or substantially similar investments using identical JVAs and transaction mechanics. The repeated onboarding of investors referred by the same promoters into the same investment program created an obvious pattern that Broad Financial saw that should have led to a refusal to facilitate the transactions.

### D. Broad Financial Was Not a Cryptocurrency Sanctuary; There Was No "Right" Plan to Invest Retirement Savings into Goliath

130. The IRS warns that prohibited transactions involve improper use of IRA assets by the owner, beneficiary, fiduciary, or other disqualified persons, and that if an IRA owner engages in a prohibited transaction the IRA can cease to be an IRA and be treated as distributed.

131. In addition, under 26 U.S.C. § 4975, an individual retirement account is a "plan," and the person who directs the IRA's investment decisions is a fiduciary and therefore a disqualified person.

132. The statute further provides that a prohibited transaction includes, among other things, any direct or indirect sale or exchange between the plan and a disqualified person, any transfer to or use of plan assets for the benefit of a disqualified person, and any act by which a fiduciary deals with plan assets in his own interest or for his own account.

133. The statute also provides that a partnership of which 50% or more of the capital or profits interest is owned directly or indirectly by a fiduciary is itself a disqualified person. If the IRA owner engages in such a prohibited transaction, the IRA ceases to be an IRA as of the first day of that taxable year.

134. Accordingly, once Broad Financial knew that investors' contemplated investment would purportedly give them significant control over the joint venture, Broad Financial knew that the proposed transaction was not an appropriate or permissible use of the SDIRA structure Broad Financial was selling and, at minimum, presented an obvious prohibited-transaction and self-dealing problem under 26 U.S.C. §§ 4975(c)(1)(A), (D), and (E), 4975(e)(2)(G), and 408(e)(2)(A).

135. Nevertheless, Broad Financial steered investors to its SDIRA plan and prepared the documents "enabling" this cryptocurrency investment without regard to the law or the "right plan."

136. Instead of declining the matter, referring investors to a licensed attorney, or warning that the contemplated transaction was unsuitable or incompatible with the structure Broad Financial was selling, Broad Financial recommended and sold that structure for the identified investment.

137. The Department of Labor ("DOL") has recognized that an IRA's purchase of a partnership interest is not automatically prohibited on every set of facts, but only where the IRA owner held a small interest, received no compensation, and the arrangement did not create the kind of conflict or dependence condemned by the statute.

138. By contrast, DOL has explained that a prohibited transaction occurs where the fiduciary causes IRA assets to be used in a manner designed to benefit himself, where the transaction creates a conflict between the IRA and the fiduciary, or where the fiduciary depends on the IRA's participation; and on materially weaker facts, DOL concluded that self-dealing was likely even where the IRA owner held only a 46%–48% interest.

139. Here, Broad Financial knew that the JVA provided investors with supposed control over and a significant interest in the joint venture.

140. Broad Financial therefore should have refused to form the entity for that purpose, refused to draft or supply an operating agreement for that structure, and directed investors to obtain independent legal and tax advice before any retirement funds were transferred.

141. By instead creating the entity, drafting or supplying the operating agreement, and facilitating the transaction, Broad Financial enabled a structure that was facially prohibited or, at minimum, obviously incompatible with the compliance analysis Broad Financial represented it would perform.

142. This was especially true because, under New Jersey unauthorized practice guidance, preparing operating agreements and similar legal documents is the practice of law and may only be performed by lawyers, while nonlawyers may not advise customers as to the proper contents of formation documents.

143. Broad Financial's preparation of an operating agreement for a structure Broad Financial knew was supposed to provide investors with significant control required legal judgment about the contents and legal effect of the governing documents and about whether the contemplated transaction could properly be housed in an IRA-owned entity at all.

144. To the extent Broad Financial contends that a SDIRA may sometimes invest in a partnership or joint venture, that contention does not defeat Plaintiffs' claim. Broad Financial's own representations were that it would determine whether a planned investment would work with the self-directed platform and would select the right plan for that investment. Faced with a disclosed transaction in which an investor would have significant control—or, at minimum, a legally uncertain, conflict-laden, fact-intensive arrangement implicating 26 U.S.C. §§ 4975(c)(1)(D) and (E)—Broad Financial could not truthfully represent that the structure it sold was the right plan, and it should not have drafted or supplied a purportedly "compliant" operating agreement without requiring independent legal review.

145. Regardless, the contemplated Goliath transaction was not the right plan for the retirement-account structure Broad Financial sold. At minimum, it was unsuitable or incompatible for the Broad Financial structure and exposed investors to serious prohibited-transaction and compliance risk because the transaction supposedly required investors to participate personally as a "partner" or joint venturer or otherwise outside the proper IRA structure.

146. Broad Financial marketed itself as possessing investment-specific expertise and as able to help investors choose the proper self-directed retirement structure for a contemplated investment.

147. Investors sought to use retirement funds to invest in Goliath and/or a related purported joint venture or partnership interest.

148. Broad Financial knew the contemplated investment and sold investors an IRA/checkbook-control structure for that investment, formed or caused the formation of an entity for the retirement account, and drafted or supplied governing documents for that entity.

149. Broad Financial's marketing to investors includes the sale of SDIRA, IRA LLC, IRA trust, and checkbook-control services for fees.

150. Broad Financial told investors that its specialists would help them "pick the right plan for your investment."

151. Broad Financial's "Getting Started" page said a specialist would provide an "experienced assessment of your personal situation," give an "honest opinion" about whether the planned investment would work with the platform," and "walk you through the entire process."

152. Broad Financial also represented that it would create an LLC with a "compliant operating agreement," open an IRS-compliant IRA LLC or trust, customize the documents to conform to applicable rules, and handle the paperwork.

153. Broad has described the IRA LLC facilitator's role as "crucial legal and administrative" and stated that the facilitator tailors the operating agreement to retirement-account requirements.

154. At the same time, Broad Financial published disclaimers that it does not provide legal, tax, or investment advice.

155. Broad Financial subclass members purchased Broad Financial's services because Broad Financial held itself out as possessing superior expertise concerning whether a specific contemplated investment could properly be executed through the structure Broad Financial was selling.

156. Broad Financial's services were not merely ministerial. They were marketed as investment-specific, suitability-oriented, compliance-oriented, and document-preparation services. Broad Financial's involvement served to legitimize the Goliath investment program in the eyes of investors. By directing investors to establish IRA-owned LLC structures and providing documentation represented as compliant retirement-account structures, Broad Financial created the appearance that the investment had been reviewed and structured in accordance with applicable retirement-account law.

157. Had Broad Financial told the truth, refused to prepare legal documents without licensed counsel, or disclosed that the contemplated investment was not compatible with the structure Broad Financial was selling, Broad Financial subclass members would not have paid Broad Financial's fees, would not have moved retirement funds into the Broad Financial-created structure, and would not have proceeded with the investment into the Goliath Ponzi scheme through that structure. The LLC entities likewise would not have been formed, would not have received defective governing documents, and would not have been used to channel retirement funds into Goliath.

158. As a direct and proximate result of Broad Financial's conduct, Broad Financial subclass members lost retirement funds, paid fees for services that were not what Broad Financial represented them to be, incurred professional and transaction costs, and suffered other monetary loss.

## IV. JPMorgan Chase and Bank of America Aided and Abetted Delgado's Ponzi Scheme.

159. The Goliath fraud only succeeded because JPMorgan Chase and Bank of America provided accounts that Delgado could use to receive investor funds and then transfer those funds to himself as well as to previous investors. These banks were among the select few who had a full view of how Goliath was using investor money.

160. Delgado was the sole signatory on Goliath's account at JPMorgan Chase and a co-signer on its account at Bank of America. He controlled both accounts. Delgado used investor funds from both accounts for personal expenses and Goliath's corporate spending. For instance, in July 2025, he transferred $500,000 from the Bank of America account and used it towards the purchase of a property in Florida held in his name.

161. Substantial sums of money in Goliath's JPMorgan Chase account, Bank of America account, and Coinbase wallets were transferred to existing investors. Between January 2023 and June 2025, Goliath transferred $50 million from its JPMorgan Chase account to investors. The company told investors that these payments were returns on their liquidity pool investments, but in reality, that money came from new investors. Similarly, between May 2025 and September 2025, $11 million from the Bank of America account was used to fund purported returns to investors, even though those funds also came from new investors.

162. Federal law requires JPMorgan Chase and Bank of America to know their customers and understand their customers' banking behavior. *See* 31 C.F.R. §§ 1020.220(a)(1), (2). Financial institutions are required to collect information about the holder of each account. When an entity opens an account, banks obtain information concerning the individuals who control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C).

163. Federal regulations, including 12 C.F.R. § 21.21, require banks to develop, administer and maintain a program to ensure compliance with federal Anti-Money-Laundering (AML) laws. Each program is approved by a bank's board of directors and: (1) provides a system of internal controls to ensure compliance at all times, (2) provides for independent testing of the bank's ongoing compliance, (3) designates an individual to coordinate and monitor compliance, and (4) provides training for appropriate personnel.

164. To further combat money laundering, the federal government established the Federal Financial Institutions Examination Council (FFIEC) in 1979. Banks like JPMorgan Chase and Bank of America receive guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector.

165. Consistent with FFIEC guidelines, financial institutions maintain a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. A customer due diligence program allows a bank to maintain awareness of the financial activity of its customers and to predict the type and frequency of transactions in which its customers are likely to engage.

166. FFIEC publications also describe certain "red flags" that indicate possible money laundering schemes and other financial misconduct mandating further inquiry, including:

a. "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

b. "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

c. "Unusual use of trust funds in business transactions or other financial activity."

d. "A large volume of . . . funds transfers is deposited into . . . an account when the nature of the accountholder's business would not appear to justify such activity."

e. "Goods or services purchased by the business do not match the customer's stated line of business."

f. "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity . . . ."

g. "Customer makes high value transactions not commensurate with the customer's known incomes."

h. "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

i. "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

j. "Funds transfers contain limited content and lack related party information."

k. "Funds transfers are sent or received from the same person to or from different accounts."

l. "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

m. "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

n. "Purpose of shell company is unknown or unclear."

o. "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

p. "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

167. As detailed below, the activity within Goliath's bank accounts at JPMorgan Chase and Bank of America reflected many common signs of money laundering and fraud. In the course of performing its customer due diligence obligations and AML compliance, the banks learned that Delgado was running a fraudulent scheme, using deposits from new investors to pay existing investors, and using investor deposits to pay for corporate and personal expenses that had no business purpose.

**A. JPMorgan Chase**

168. Goliath held a business bank account at JPMorgan Chase (ending in 0305). Delgado was the sole signatory on the account and had full control over it. He determined how investor funds within the account would be allocated, and he was the one who directed transfers from the account.

169. Between January 2023 and June 2025, approximately $253 million in investor funds was deposited into Goliath's JPMorgan Chase account.

170. During this same period, JPMorgan Chase saw Delgado use investor funds from this account for several of his high-dollar value personal purchases. This included a wire transfer of over $350,000 to purchase property in Sanford, Florida titled in his name and purchases of luxury vehicles and designer jewelry and watches. Goliath also used investor funds deposited into this account to pay for Goliath's corporate spending, luxury travel accommodations, and

extravagant events. And Delgado sent approximately $50 million in purported returns to investors directly from this same account.

171. Consistent with federal regulations, JPMorgan Chase was obligated to know its customer—Goliath—and the holder of the account—Delgado. These "know your customer" obligations are ongoing and required JPMorgan Chase to familiarize itself with Delgado, the nature of Goliath's operations, the source and legitimacy of its funds, and the purpose of its bank account and ongoing financial transactions.

172. By way of example, JPMorgan Chase knew, via their "Know Your Customer" obligations, that Goliath claimed to invest money in cryptocurrency for investors, which they publicly called "partners." JPMorgan Chase knew that a cryptocurrency pool operator should have been licensed as a commodities pool operator with the Commodities Futures Trading Commission and a member of the National Futures Association, as well as registered with the Financial Crimes Enforcement Network ("FinCEN"), but neither Goliath nor Delgado were licensed.

173. Further, the JPMorgan Chase account reflected minimal transfers to legitimate cryptocurrency exchanges. While Goliath claimed to invest funds into "cryptocurrency liquidity pools," investigators allege that of the $328 million collected, only approximately $1 million was actually invested in any crypto-related assets.

174. As a result of its customer due diligence, JPMorgan Chase learned that Delgado was operating a fraudulent scheme by using deposits from new investors to pay existing investors and using investor deposits to pay Delgado's personal expenses, as well as Goliath's corporate expenses.

175. JPMorgan Chase was also obligated to monitor Goliath's account for "red flags" indicative of potential money laundering and fraud and to report suspicious activity to

governmental authorities. JPMorgan Chase's knowledge of Delgado's fraud was an inevitable consequence of several red flags that made the scheme obvious to someone in JPMorgan Chase's position, including:

a. JPMorgan Chase saw Goliath's misappropriation of funds in Goliath's account at the bank: new investor money was deposited into Account 0305, and then some of that money was used to distribute purported returns to investors.

b. Goliath was among JPMorgan Chase's largest clients in the region, making its banking activity highly visible and important to JPMorgan Chase.

c. Delgado had sole control over Goliath's account—an unusual arrangement for an investment company of this size, which would normally employ a management structure and multiple signatories.

d. Goliath's account showed many funds transfers sent in large, round dollar amounts.

e. Goliath's transfer activity was unexplained, repetitive, and showed unusual patterns.

f. Goliath's transfers were sent or received from the same person to or from different accounts.

g. A large volume of funds transfers was deposited into Goliath's account when the nature of Goliath's business would not appear to justify such activity.

h. Goliath's account showed that it required new investor money each month to meet its monthly obligations.

i. Goliath's payments or receipts had no apparent links to legitimate contracts, goods, or services.

j. Payments to or from Goliath's account had no stated purpose, did not reference goods or services, or identified only a contract or invoice number.

k. Goods or services purchased by Goliath did not match Goliath's stated line of business.

l. Goods or services, if identified, did not match profile of Goliath's stated financial activity.

m. Investor funds were commingled with other investor funds, as well as with Goliath's corporate money and money Delgado was using for personal expenses.

176. JPMorgan Chase provided the banking assistance that Delgado needed to successfully operate his fraudulent scheme. Although JPMorgan Chase knew Delgado was defrauding investors and using their contributions to pay previous investors and for Delgado's personal expenses, it chose to profit from—rather than expose—the illicit business.

**B. Bank of America**

177. Goliath also held a business bank account at Bank of America (ending in 9136). Delgado was a co-signer on that account and had control over how investor funds within it were allocated, even though other individuals at Goliath may have also had access to the same account.

178. Between May 2025 and September 2025, approximately $75 million in investor funds was deposited into Goliath's Bank of America account.

179. During this same period, Bank of America saw Delgado use investor funds from this account for personal purchases, including a wire transfer of $500,000 to purchase property in Windermere, Florida titled in his name. Goliath also used investor funds deposited into this account to pay for Goliath's corporate spending, luxury travel accommodations, and extravagant events. These personal expenditures included: a) the purchase of the real property in Winter Park, Florida,

in July 2025 for approximately $3.2 million; and b) the purchase of the real property in Windermere, Florida, in September 2025 for approximately $8.5 million.

180. Delgado also transferred approximately $42 million to Goliath's cryptocurrency exchange accounts at Coinbase and approximately $11 million in purported returns to investors directly from Goliath's Bank of America account.

181. Bank of America was obligated to know its customer—Goliath—and the holder of the account—Delgado. These "know your customer" obligations are ongoing and required Bank of America to familiarize itself with Delgado, the nature of Goliath's operations, the source and legitimacy of its funds, and the purpose of its bank account and ongoing financial transactions.

182. In the course of performing its customer due diligence obligations, Bank of America learned that Delgado was operating a fraudulent scheme, using deposits from new investors to pay existing investors, and using investor deposits to pay Delgado's personal expenses.

183. Bank of America was also obligated to monitor Goliath's account for "red flags" indicative of potential money laundering and fraud and to report suspicious activity to governmental authorities. Bank of America's knowledge of Delgado's Ponzi scheme was an inevitable consequence of several red flags that made the scheme obvious to someone in the bank's position:

a. Bank of America saw Goliath's misappropriation of funds in Goliath's account at the bank: new investor money was deposited into Account 9136, and then some of that money was used to distribute purported returns to investors.

b. Goliath was among Bank of America's largest clients in the region, making its banking activity highly visible and important to Bank of America.

c. Delgado kept close control over Goliath's account—an unusual arrangement for an investment company of this size, which would normally employ a management structure and multiple signatories

d. Goliath's account showed many funds transfers sent in large, round dollar amounts.

e. Goliath's transfer activity was unexplained, repetitive, and showed unusual patterns.

f. Goliath's transfers were sent or received from the same person to or from different accounts.

g. A large volume of funds transfers was deposited into Goliath's account when the nature of Goliath's business would not appear to justify such activity.

h. Goliath's account showed that it required new investor money each month to meet its monthly obligations.

i. Goliath's payments or receipts had no apparent links to legitimate contracts, goods, or services.

j. Payments to or from Goliath had no stated purpose, did not reference goods or services, or identified only a contract or invoice number.

k. Goods or services purchased by Goliath did not match Goliath's stated line of business.

l. Goods or services, if identified, did not match profile of Goliath's stated financial activity.

m. Investor funds were commingled with other investor funds, as well as with Goliath's corporate money and money Delgado was using for personal expenses.

184. Along with JPMorgan Chase, Bank of America provided the banking assistance that Delgado needed to operate his fraudulent scheme. Although Bank of America knew Delgado was defrauding investors and using their contributions to pay previous investors and for Delgado's personal expenses, it chose to profit from—rather than expose—his illegal conduct.

**V. Coinbase Substantially Assisted the Ponzi Scheme.**

185. As part of the Goliath scheme, investor funds were transmitted from traditional bank accounts, including accounts at JPMorgan Chase and Bank of America, to accounts maintained by Goliath at Coinbase. Once received at Coinbase, those funds were converted into digital assets, including stablecoins such as USDC. Following conversion, the digital assets were transferred from Coinbase accounts to external cryptocurrency wallets controlled by Delgado and other Goliath promoters.

186. Between 2023 and 2025, approximately $165 million in investor funds were transmitted to Goliath-controlled accounts at Coinbase. Of that amount, only approximately $1.5 million was deployed into actual liquidity pools or any legitimate cryptocurrency-based investment activity. The remaining funds were transferred to external wallets, redistributed to earlier investors, or otherwise misappropriated.

187. In addition to receiving investor funds, Goliath's Coinbase accounts were used to transmit cryptocurrency to numerous individual Coinbase user accounts associated with investors. These outbound transfers were represented to investors as "returns" or "profits," and were used to reinforce the appearance of a legitimate and successful investment operation. Goliath executives and agents instructed investors to open Coinbase accounts specifically for the purpose of receiving these payments.

188. As a result, both the inflow of investor funds and the outflow of purported returns occurred within Coinbase's ecosystem, providing Coinbase with visibility into both sides of the scheme's transactional activity.

**A. Transaction Activity Inconsistent with Stated Business Model**

189. Goliath represented that investor funds would be actively deployed into cryptocurrency trading strategies and liquidity pools. A legitimate operation of that nature would generate observable transaction patterns, including sustained trading activity, interaction with decentralized finance protocols, and inflows reflecting profits generated from those activities. The transaction activity within Coinbase's systems did not reflect such a business model.

190. The expected intermediate step—deployment of assets into trading strategies or liquidity pools—was largely absent from the transaction activity observable within Coinbase's platform, indicating that funds were diverted before any legitimate investment activity occurred. Goliath's transaction activity included large and repeated inflows of funds, rapid conversion into digital assets, and near-immediate transfers to external cryptocurrency wallets.

191. Goliath's transaction activity conducted through Coinbase's platform did not reflect patterns consistent with profitable cryptocurrency trading. The absence of sustained investment activity, combined with the rapid movement and dissipation of funds, is inconsistent with any legitimate asset management or trading strategy.

192. A cryptocurrency investment operation of the type represented to investors necessarily requires sustained interaction with trading platforms or decentralized protocols; Goliath's transaction activity conducted through Coinbase's platform reflects no such activity.

193. As a regulated financial intermediary, Coinbase maintains systems designed to monitor transaction activity and identify conduct indicative of fraud or misuse of customer funds, including activity inconsistent with the stated purpose of institutional accounts.

**B. Coinbase's Regulatory Obligations and Compliance Framework**

194. Coinbase operates as a regulated financial intermediary subject to federal and state laws governing money transmission, anti-money laundering, and the prevention of financial crime, including the Bank Secrecy Act (BSA), 31 U.S.C. § 5311 et seq., and regulations administered by FinCEN.

195. As part of its regulatory obligations, Coinbase is required to implement customer identification and due diligence procedures designed to understand the nature and purpose of customer accounts, including institutional accounts. These obligations require Coinbase to obtain and maintain information concerning the expected use of each account, including the source of funds, anticipated transaction activity, and the nature of the customer's business.

196. Coinbase is further required to ensure that account activity remains consistent with the representations made in connection with the account and to identify discrepancies between expected and actual use.

197. Coinbase is also required to maintain transaction monitoring systems designed to analyze account activity on an ongoing basis and to identify patterns indicative of fraud, misuse of funds, or other unlawful conduct. These systems are designed to evaluate not only individual transactions, but also broader patterns of activity, including the volume, frequency, structure, and flow of funds across accounts. Such monitoring necessarily involves the identification of activity inconsistent with a customer's stated business model, including the absence of legitimate investment activity where such activity is represented.

198. Under the BSA and related regulations, Coinbase is required to identify and investigate suspicious activity, including transactions that lack apparent lawful purpose or are inconsistent with expected account activity. These obligations include identifying patterns such as large inflows of funds followed by rapid transfers, limited retention of assets, and the redistribution of funds without underlying economic activity.

199. Where such activity is identified, Coinbase is required to investigate and, where appropriate, report such activity to regulators.

200. Goliath's transaction activity—including the receipt of investor funds, conversion into digital assets, transfers to external wallets, and the redistribution of funds as purported returns—occurred within accounts maintained on Coinbase's platform. This activity was required to be monitored, evaluated, and assessed by Coinbase as part of its ongoing compliance obligations.

201. The nature of Goliath's activity, when considered in light of the expected use of an account representing a cryptocurrency investment operation, reflects a discrepancy between stated purpose and actual use that Coinbase's systems are designed to identify.

202. Because Coinbase was required to obtain information concerning the nature and purpose of the Goliath accounts, and to monitor the transaction activity conducted through those accounts, it necessarily possessed the information needed to evaluate whether that activity was consistent with a legitimate investment operation.

203. Coinbase therefore knew of the nature of the transaction activity conducted through its platform, including that Goliath was using new investor funds to pay purported returns to existing investors.

### C. Coinbase's Monitoring Capabilities and Obligations

204. Coinbase operates as a financial intermediary that maintains systems designed to monitor account activity, record transactions, and identify unusual or suspicious patterns. Coinbase maintains records reflecting deposits, conversions, transfers, and balances associated with customer accounts. Coinbase is required to implement and maintain systems designed to identify transactions inconsistent with the stated nature and purpose of customer accounts.

205. Coinbase had the ability to restrict, delay, or otherwise control the movement of digital assets within its platform, including the transfer of assets to external wallets. Coinbase therefore possessed both visibility into and control over the conduct at issue.

206. Coinbase's monitoring systems are specifically designed to detect activity indicative of fraud, including inconsistencies between expected and actual account usage, and patterns reflecting the recycling or redistribution of assets without legitimate economic purpose.

207. These systems provide Coinbase with the ability not only to observe suspicious activity, but also to investigate, flag, and take action in response to such activity, including restricting transactions, reviewing account behavior, and preventing further misuse of its platform.

208. In circumstances where both the inflow of investor funds and the distribution of purported returns occur within Coinbase's platform, Coinbase's systems provide a comprehensive view of the transaction lifecycle, enabling the identification of circular fund flows and other patterns uniquely indicative of fraudulent investment schemes.

### D. Red Flags and Indicators of Fraud

209. The transaction patterns present in the Goliath accounts exhibited multiple indicia of fraud and misappropriation, including:

a. large and repeated inbound transfers of funds from multiple sources;

b. rapid conversion of fiat currency into digital assets;

c. near-immediate outbound transfers to external wallets;

d. lack of meaningful trading or investment activity; and

e. absence of corresponding inflows reflecting investment returns.

210. These patterns are widely recognized as indicators of fraudulent activity, including Ponzi schemes and misappropriation of funds.

211. The use of a centralized account to receive large volumes of investor funds and then distribute payments to numerous individual user accounts is a hallmark of Ponzi schemes and other fraudulent investment operations.

212. The transaction activity also exhibited a closed-loop pattern in which funds deposited into Goliath's Coinbase accounts were subsequently redistributed to other Coinbase user accounts as purported returns, without any intervening profit-generating activity. Such circular movement of funds, absent legitimate economic output, is a defining characteristic of Ponzi schemes.

213. In combination, the volume, velocity, structure, and repetition of these transactions created a pattern that was not merely suspicious, but unmistakably inconsistent with any legitimate cryptocurrency investment operation and uniquely indicative of systematic misappropriation of investor funds.

**E. Coinbase's Knowledge of the Scheme**

214. The discrepancy between Goliath's stated business model and the transaction activity observable within Coinbase's systems was substantial and persistent.

215. Coinbase observed the rapid inflow and outflow of funds, the absence of legitimate investment activity, and the lack of corresponding returns. These patterns were inconsistent with the operation of a legitimate cryptocurrency investment program and indicative of misappropriation and fraud. The only reasonable inference from the transaction activity observable

within Coinbase's platform is that Coinbase knew that Goliath was not operating a legitimate cryptocurrency investment program.

216. Coinbase's own public disclosures confirm its awareness that cryptocurrency platforms are susceptible to fraud and misuse, and that transaction monitoring is necessary to identify and prevent such conduct. The transaction patterns described herein fall squarely within the risks that Coinbase has acknowledged.

217. Because both the receipt of investor funds and the distribution of purported returns occurred within Coinbase's platform, Coinbase had direct visibility into the circular flow of funds characteristic of a Ponzi scheme.

218. The combination of (i) large inbound transfers, (ii) rapid outbound transfers to external wallets, and (iii) repeated distributions to Coinbase user accounts, created a transaction pattern that is uniquely indicative of fraudulent investment activity and could not have been missed by a platform with Coinbase's monitoring capabilities.

**F. Coinbase's Role in Enabling the Scheme**

219. Despite the presence of these indicators, Coinbase continued to process transactions on behalf of Goliath, including the conversion of investor funds into digital assets and the transfer of those assets to external wallets.

220. Without Coinbase's services, Goliath could not have converted investor funds into digital assets at the scale alleged or transferred those assets in the manner required to sustain the scheme. By continuing to provide these services in the face of clear indicators of misconduct, Coinbase enabled the operation and continuation of the Goliath scheme.

221. Coinbase actively facilitated the conversion and rapid dissipation of investor funds in a manner that allowed the scheme to function and evade traditional financial oversight.

222. Coinbase's platform also enabled the distribution of purported "returns" to investors through transfers to other Coinbase user accounts, thereby reinforcing the appearance of a legitimate and profitable investment operation and encouraging continued inflows of investor capital.

223. By facilitating both the conversion of investor funds and the internal redistribution of those funds as purported profits, Coinbase provided the infrastructure necessary not only to execute the scheme, but to sustain it over time by maintaining investor confidence.

## VI. Plaintiffs' Experience

### A. Plaintiffs John D. Euliano and CTI

224. Plaintiff John D. Euliano is the Trustee of the Euliano Trust, a trust created and existing under the laws of the State of Florida. Plaintiff CTI is a limited liability company organized and existing under the laws of the State of Florida managed and controlled by Euliano.

225. Between June 2023 and August 2025, Euliano, individually and/or through the Euliano Trust, invested approximately $750,000 with Goliath Ventures. Between March 2025 and September 2025, CTI invested approximately $210,000 with Goliath Ventures. Together, Euliano and CTI invested approximately $960,000 with Goliath Ventures.

226. Euliano learned of the opportunity to invest in the venture from Nick Petrillo, who was his representative at Goliath. Petrillo told Euliano that Goliath would pay a guaranteed 5% monthly return, which Euliano could either receive as a payout, roll over and compound, or allocate between payout and compounding in any combination he chose. Euliano also spoke with Matt Burks, Goliath's Chief Compliance Officer, who represented that the Goliath investment was safer than a bank investment because Goliath maintained 100% of investor deposits in liquid form at all times—something Burks said a bank could not say. Burks further represented that he had

seen all of Goliath's money and accounts, had performed a full analysis of the fund, and had certified that Goliath was operating exactly as promised. After Euliano made certain investments, Goliath, through Delgado, Petrillo, and Burks, represented that it had obtained a surety insurance policy that supposedly insured investor deposits against loss. That representation convinced Euliano to increase his investment. Euliano relied on these representations in deciding to invest and to continue investing with Goliath.

227. On or about September 6, 2023, Euliano, individually, executed a joint venture agreement with Goliath. On or about August 17, 2023, Delgado executed the agreement on behalf of Goliath Ventures. The agreement stated that Euliano would contribute funds for placement into liquidity pools and that he would be entitled to monthly interest from his contribution. Through the agreement, Goliath guaranteed the return of Euliano's principal contribution. Goliath also guaranteed that if Euliano elected to withdraw some or all of his investment, Goliath would process the withdrawal request within a 24-to-72-hour period.

228. Euliano, individually and/or through the Euliano Trust, invested a total of approximately $750,000 with Goliath in multiple transfers: $25,000 on or about June 25, 2023; $25,000 on or about July 25, 2023; $50,000 on or about February 22, 2024; $25,000 on or about June 25, 2024; $75,000 on or about July 25, 2024; $25,000 on or about May 1, 2025; $25,000 on or about May 5, 2025; $150,000 on or about June 27, 2025; $100,000 on or about July 15, 2025; and $250,000 on or about August 2, 2025.

229. On or about May 16, 2025, Euliano, on behalf of the Euliano Trust, executed a joint venture agreement with Goliath whereby Euliano transferred his individual account to the Euliano Trust. On or about May 17, 2025, Delgado executed the agreement on behalf of Goliath Ventures. The agreement stated that the Euliano Trust would contribute funds for placement into liquidity

pools and that it would be entitled to monthly interest from his contribution. Through the agreement, Goliath guaranteed the return of the Euliano Trust's principal contribution. Goliath also guaranteed that if the Euliano Trust elected to withdraw some or all of its investment, Goliath would process the withdrawal request within a 24-to-72-hour period.

230. After the Euliano Trust JVA was executed, Euliano continued investing additional funds with Goliath. Those later investments included $25,000 on or about May 1, 2025; $25,000 on or about May 5, 2025; $150,000 on or about June 27, 2025; $100,000 on or about July 15, 2025; and $250,000 on or about August 2, 2025.

231. On or about March 4, 2025, Euliano, on behalf of CTI, executed a joint venture agreement with Goliath. On or about March 4, 2025, Delgado executed the agreement on behalf of Goliath Ventures. The agreement stated that CTI would contribute funds for placement into liquidity pools and that it would be entitled to monthly interest from its contribution. Through the agreement, Goliath guaranteed the return of Euliano's principal contribution. Goliath also guaranteed that if CTI elected to withdraw some or all of its investment, Goliath would process the withdrawal request within a 24-to-72-hour period.

232. CTI invested a total of approximately $210,000 with Goliath in multiple transfers: $150,000 on or about March 4, 2025; $10,000 on or about June 3, 2025; $10,000 on or about June 20, 2025; $20,000 on or about July 1, 2025; and $20,000 on or about September 12, 2025.

233. Euliano, on behalf of both the Euliano Trust and CTI, received monthly communications from Goliath about the new account balance, which reflected the monthly interest the investment was supposedly accruing. Euliano, through CTI, took 5% monthly distributions from the CTI account. Euliano otherwise generally "rolled over" the monthly returns personal and trust investment, except for a $40,000 distribution received on or about October 16, 2025.

234. During the period he was making investments on behalf of the Euliano Trust and CTI, Euliano was never informed of the true nature of how Goliath and Delgado were using the monies invested. Had Euliano known the truth, Euliano never would have invested in Goliath through the Euliano Trust and CTI.

235. On or about January 20 and 21, 2026, Euliano requested to withdraw his investment from Goliath for both the Euliano Trust and CTI, respectively, which had accumulated to approximately $1,522,574. Goliath confirmed that it had received Euliano's request and that it would distribute the funds to him within seven to ten business days. Goliath, however, never returned the Euliano Trust and CTI's investment pursuant to Euliano's request.

236. To date, Euliano received approximately $59,000 in purported returns for CTI's investment and approximately $40,000 in purported returns for his personal and/or Euliano Trust investment. The CTI payments consisted of $7,500 on or about April 10, 2025; $7,500 on or about May 9, 2025; $7,500 on or about June 12, 2025; $8,000 on or about July 15, 2025; $9,500 on or about August 14, 2025; $9,500 on or about September 15, 2025; and $9,500 on or about October 16, 2025. Euliano also received one personal and/or trust distribution of $40,000 on or about October 16, 2025. The losses Euliano has incurred have caused hardship to Euliano and his family.

**B. Plaintiffs Cole Brantley and CGB Lois T, LLC**

237. Plaintiff Cole Brantley is the IRA owner, sole member, and manager of CGB Lois T, LLC, and the sole beneficial owner of all assets held or invested through the CGB. CGB is a limited liability company formed for the specific purpose of serving as the checkbook-control vehicle for Plaintiff Cole Brantley's Self-Directed IRA. CGB was the entity into which Brantley's retirement funds were deposited, and CGB was the vehicle through which those funds were

invested in the Goliath Ventures scheme. Both Brantley and CGB entered into a Goliath Ventures Joint Venture Agreement and suffered substantial financial losses as a result.

238. Between January 2025 and December 2025, Brantley, both individually and through CGB, invested a combined total of approximately $822,046 with Goliath Ventures.

239. Brantley learned of the opportunity to invest in the venture from Chad Lio, Goliath's Director of Partner Services. Brantley expressed concerns to Lio about the legitimacy of the investment, the lack of transparency, the protection of investor principal, audits, compliance review, and how Goliath's model operated. In response, Lio represented that Goliath had SEC approval, a Fidelity Trust bond protecting 100% of invested principal, and third-party audits and compliance reviews conducted every three to six months. Lio also represented that he had personally made substantial money through Goliath and that numerous attorneys had invested in the venture, which he presented as further evidence of Goliath's legitimacy. Other Goliath representatives, including Michael Hernandez, Matthew Burks, Piers Curry, and David Panzik, also reassured Brantley that his investment was safe. Brantley relied on these representations in deciding to invest and to continue investing with Goliath.

240. On January 7, 2025, April 23, 2025, and May 8, 2025, Brantley, individually and on behalf of CGB Lois T, LLC, executed joint venture agreements with Goliath. On or about January 7, 2025, April 23, 2025, and May 8, 2025, Chris Delgado executed the agreements on behalf of Goliath Ventures. The agreements stated that Brantley and CGB Lois T, LLC would contribute funds for placement into liquidity pools and that he would be entitled to monthly interest from his contribution. Through the agreements, Goliath guaranteed the return of Brantley's and CGB Lois T, LLC's principal contributions. Goliath also guaranteed that if Brantley or CGB Lois

T, LLC elected to withdraw some or all of their investments, Goliath would process the withdrawal request within a 24-to-72-hour period.

241. On or about January 27, 2025, per Goliath's instructions, Brantley wired $350,000 to Goliath's JPMorgan Chase account. On or about March 27, 2025, per Goliath's instructions, Brantley wired an additional $350,000 to Goliath's JPMorgan Chase account. On or about May 6, 2025, per Goliath's instructions, Brantley wired an additional $120,348.69 to Goliath's JPMorgan Chase account.

242. Brantley, both individually and on behalf of CGB Lois T, LLC, received monthly communications from Goliath about his new account balance, which reflected the monthly interest his investment was accruing. Brantley and CGB Lois T, LLC largely "rolled over" his monthly returns.

243. During the period he was making investments, Brantley was never informed of the true nature of how Goliath and Chris Delgado were using his money. Had he known the truth, Brantley never would have invested in Goliath Ventures.

244. To date, Brantley received two distributions totaling approximately $65,575.93 in purported returns on his individual investments. Combined, Brantley and CGB Lois T, LLC have incurred net principal losses totaling approximately $756,470 to date. The losses Brantley has incurred have caused significant financial hardship to Brantley and his family.

**C. Plaintiffs Lucrezia Presta and Presta LLC**

245. Plaintiff Lucrezia Presta is the IRA owner, sole member, and manager of Presta LLC, and the sole beneficial owner of all assets held or invested through Presta LLC. Presta LLC is a limited liability company formed for the specific purpose of serving as the checkbook-control vehicle for Presta's Self-Directed IRA. Presta LLC was the entity into which Presta's retirement

funds were deposited was the vehicle through which those funds were invested in the Goliath Ventures scheme. On or about September 2, 2025, Presta LLC opened and maintained a business checking account at Titan Bank, N.A., with Lucrezia Presta listed as a signer.

246. Between September 2025 and October 2025, Presta LLC invested a total of approximately $269,000 with Goliath Ventures.

247. Presta learned of the opportunity to invest in the venture from Robert "Chris" Florence and Mark Biddinger, who were promoters associated with Wealth MD / Goliath. Florence and Biddinger promoted the opportunity to Presta and induced her to invest with Goliath through the Wealth MD / Goliath relationship. Presta understood from those promoters and the materials provided to her that Goliath was a legitimate investment opportunity in which her funds would be placed into cryptocurrency liquidity pools, that she would receive monthly returns from those contributions, and that her principal would be protected and returned. Presta relied on those representations in deciding to invest.

248. On or about September 2, 2025, Presta, on behalf of Presta LLC, entered into a written Joint Venture Agreement with Goliath. On or about September 2, 2025, Delgado executed the agreement on behalf of Goliath Ventures. The agreement stated that Presta LLC would contribute funds for placement into liquidity pools and that it would be entitled to monthly profit from its contribution. Through the agreement, Goliath guaranteed the return of Presta LLC's principal contribution. Goliath also represented that Presta LLC could withdraw all or part of its account balance by sending a withdrawal request, and that Goliath would use reasonable efforts to return the requested withdrawal amount within 5 to 7 business days.

249. Presta, on behalf of Presta LLC, elected the "Monthly Rollover" payout option under the JVA and received monthly communications from Goliath about her new account balance,

which reflected the monthly profits her investment was supposedly accruing. Presta "rolled over" the monthly returns.

250. During the period she was making investments, Presta was never informed of the true nature of how Goliath and Delgado were using her money. Had she known the truth, Presta never would have invested in Goliath.

251. To date, Presta received no payments in purported returns on her investments individually and through Presta LLC. The losses Presta has incurred have caused hardship to Presta and her family.

**D. Plaintiff Robby A. Steele**

252. Between February 20, 2025, and March 13, 2025, Plaintiff Robby A. Steele invested approximately $652,000 with Goliath Ventures.

253. Steele learned of the opportunity to invest in the venture from financial planner who put him in touch with John Mason, an insider who worked directly for Goliath. Mason told him that Goliath was a wonderful investment which would pay high interest. Mason advised him to invest all the cash he had on hand, totaling $340,000. He also advised him to liquidate his 401k—valued at approximately $500,000 at that time—and to pay the tax penalties because he would more than make up for those losses in a few months. Steele transferred the remaining cash, totalling $312,000, to Goliath. Steele relied on those representations made in deciding to invest.

254. On or about February 6, 2025, Steele entered into a written Joint Venture Agreement with Goliath. On or about February 6, 2025, Delgado executed the agreement on behalf of Goliath Ventures. The agreement stated that Steele would contribute funds for placement into liquidity pools and that it would be entitled to monthly interest from its contribution. Through the agreements, Goliath guaranteed the return of Plaintiff Robby Steele's principal contribution.

Goliath also guaranteed that if Steele elected to withdraw some or all its investment, Goliath would process the withdrawal request within a 24-to-72-hour period.

255. On or about February 20, 2025, per Goliath's instructions, Steele wired $340,000 to Goliath's JPMorgan Chase account. On or about March 12, 2025, per Goliath's instructions, Steele wired $312,000 to Goliath's JPMorgan Chase account—the total funds left after liquidating his 401k account.

256. Steele received monthly communications from Goliath about his new account balance, which reflected the monthly interest his investment was accruing. Between May and September 2025, Steele received distributions of $5,000 per month, totaling $30,000, although the money did not come directly from Goliath—instead, the funds were sent to Steele by a company owned by Mason, Pulse Consulting Group.

257. During the period she was making investments, Steele was never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, Steele never would have invested in Goliath.

258. To date, Steele received payments of $30,000 in purported returns on his investments. The losses Steele has incurred have caused hardship to Steele and his family.

**E. Plaintiff Brian J. Bailey**

259. Between March 2024 and August 2025, Plaintiff Brian J. Bailey invested approximately $549,747 with Goliath Ventures.

260. Bailey learned of the opportunity to invest in the venture from a friend who had invested with Goliath. Goliath, through one of its employees, told Bailey in 2024 that his investment funds would be placed in a liquidity pool that ran on a decentralized cryptocurrency

exchange, and that he would receive monthly interest payments generated by that liquidity pool. Bailey relied on those representations in deciding to invest.

261. On or about March 14, 2024, Bailey executed a joint venture agreement with Goliath. On or about December 7, 2024, Delgado executed the joint venture agreement on behalf of Goliath. The agreement stated that Bailey would contribute funds for placement into liquidity pools and that he would be entitled to 3% monthly interest from his contribution for amounts up to $500,000, and 4% monthly interest from his contributions above $500,000. Through the agreement, Goliath guaranteed the return of Bailey's principal contribution. Goliath also guaranteed that if Bailey elected to withdraw some or all of his investment, Goliath would process the withdrawal request promptly.

262. In March 2024, per Goliath's instructions, Bailey wired approximately $200,000 to Goliath's JPMorgan Chase account. Subsequently, Bailey wired approximately $350,000 more in additional investments to Goliath's JPMorgan Chase account, also purportedly for placement into liquidity pools.

263. To place more funds into Goliath, Bailey liquidated a 457 account commonly used by public servants for retirement funds, valued at approximately $133,000.

264. Bailey received monthly communications from Goliath about his new account balance, which reflected the monthly interest his investment was accruing.

265. During the period he was making investments, Bailey was never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, Bailey never would have invested in Goliath.

266. To date, Bailey received payments of $87,000 in purported returns on his investments. The losses Bailey has incurred have caused hardship to Bailey and his family

### F. Plaintiff Eric Logwood

267. Between June 6, 2025 and June 12, 2025, Plaintiff Eric Logwood invested approximately $3,250,000 with Goliath Ventures. $1,000,000 of those funds was invested through a Nevada single-member LLC, Apex Ventures LLC ("Apex") of which Logwood is the sole member. The remaining $2,250,000 was invested through the Lita Trust.

268. Plaintiff Eric Logwood is a businessperson in Las Vegas, Nevada who works in the medical device distribution industry. Through that work, Logwood became acquainted with Nick Petrillo, the CEO of Goliath Ventures, because Petrillo had done business with Logwood and others in the medical supply industry. Petrillo represented to Logwood that he was the CEO of Goliath Ventures, that Goliath was performing very well, and that Petrillo himself was making substantial money through Goliath. Petrillo described Goliath as a "liquidity pool" investment opportunity and explained why he believed it was a good investment. Logwood relied on Petrillo's representations in deciding to invest.

269. Logwood made his initial investment through Apex. Between February 1, 2023 and April 4, 2023, Apex Ventures LLC invested a total of $1,000,000 with Goliath Ventures. Apex's investment was made pursuant to a Joint Venture Agreement dated January 26, 2023, between Goliath Ventures Inc. and Apex Ventures. Under that agreement, Apex's funds were to be contributed into cryptocurrency liquidity pools, and Apex was entitled to receive monthly profits generated by its contributions. Apex wired its investment to Goliath Ventures' JPMorgan Chase account in four transfers: $200,000 on February 1, 2023; $200,000 on February 23, 2023; $100,000 on March 1, 2023; and $500,000 on April 4, 2023. Apex received no return of principal or purported profits on those investments.

270. After Apex's initial investment, Goliath provided investors, including Logwood, access to a mobile application through which they could view their purported account balances and returns. Through the application, Logwood saw what appeared to be extraordinary "hyper-compounding" growth on Apex's investment. Logwood did not withdraw those purported returns and instead allowed them to roll over.

271. In 2024, Logwood created a trust, the Lita Trust, of which he is both trustee and beneficiary. A substantial portion of Logwood's assets were placed into that trust.

272. In 2025, based on the purported performance of Apex's earlier investment as reflected in Goliath's mobile application, and based on Goliath's continued representations concerning the profitability and growth of the investment, Logwood decided to invest additional funds with Goliath through the Lita Trust.

273. Between June 6, 2025 and June 12, 2025, Logwood invested approximately $2,250,000 with Goliath through the Lita Trust.

274. On or about September 26, 2025, Logwood entered into a written Joint Venture Agreement with Goliath. On or about September 26, 2025, Delgado executed the agreement on behalf of Goliath Ventures. The agreement stated that Logwood would contribute funds for placement into liquidity pools and that he would be entitled to monthly interest from its contribution. Through the agreement, Goliath guaranteed the return of Logwood's principal contribution and represented that Logwood could withdraw all or part of his account balance by sending a withdrawal request, and that Goliath would use reasonable efforts to return the requested withdrawal amount within 5 to 7 business days.

275. On or about June 6, 2025, per Goliath's instructions, Logwood wired $1,250,000 to Goliath's Bank of America account. On or about June 12, 2025, Logwood wired an additional

$1,000,000 to Goliath's Bank of America account. Goliath's Bank of America wire instructions identified the recipient as Goliath Ventures Inc., account number ending in 9136, with a Bank of America routing number of 026009593, and instructed that all wire transfers include the partner's full name and "JOINT VENTURE" in the memo or reference field.

276. Logwood elected the "Monthly Rollover" payout option under the September 26, 2025 Joint Venture Agreement and received monthly communications from Goliath about his new account balance, which reflected the monthly profits his investment was accruing. Logwood "rolled over" his monthly returns.

277. During the period he was making investments, Logwood was never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, Logwood never would have invested in Goliath.

278. To date, Logwood has received no payments as purported returns on his investments. The losses Logwood has incurred have caused hardship to Logwood and his family.

**G. Plaintiff JP Politano**

279. Between December 2024 and April 2025, Plaintiff JP Politano invested approximately $80,000 with Goliath Ventures.

280. Politano learned of the opportunity to invest in the venture from a friend who had invested with Goliath. Goliath, through one of its employees Alex Bukalo, told Politano in person and via e-mails and text messages in late 2024 that his investment funds would be placed in a liquidity pool that ran on a decentralized cryptocurrency exchange, and that he would receive monthly interest payments generated by that liquidity pool. Politano relied on those representations in deciding to invest.

281. On or about December 26, 2024, Politano executed a joint venture agreement with Goliath. On or about December 26, 2024, Delgado executed the joint venture agreement on behalf of Goliath. The agreement stated that Politano would contribute funds for placement into liquidity pools and that he would be entitled to 4% monthly interest from his contribution. Through the agreement, Goliath guaranteed the return of Politano's principal contribution. Goliath also guaranteed that if Politano elected to withdraw some or all of his investment, Goliath would process the withdrawal request within a 24-to-72-hour period.

282. On or about December 27, 2024, per Goliath's instructions, Politano wired $50,000 to Goliath's JPMorgan Chase account. Subsequently, Politano funded a total of approximately $30,000 more in additional investments to Goliath's JPMorgan Chase account, also purportedly for placement into liquidity pools.

283. Politano received monthly communications from Goliath about his new account balance, which reflected the monthly interest his investment was accruing. Politano primarily "rolled over" his monthly returns.

284. During the period he was making investments, Politano was never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, Politano never would have invested in Goliath.

285. On or about February 23, 2026, Politano requested to withdraw his investment from Goliath, which had accumulated to approximately $117,000. Goliath confirmed that it had received Politano's request and that it would distribute the funds to him within seven to ten business days. Goliath never returned Politano's investment pursuant to his request.

286. To date, Politano received payments of $7,200 in purported returns on his investments. The losses Politano has incurred have caused hardship to Politano and his family.

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATIONS

287. Plaintiffs and the Class did not and could not have discovered the facts constituting Defendants' unlawful conduct until February 24, 2026, when Delgado was arrested and charged with money laundering and wire fraud.

288. Because Plaintiffs and Class members could not have reasonably discovered the facts constituting Defendants' unlawful conduct until February 24, 2026, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

## CLASS ACTION ALLEGATIONS

289. Plaintiffs bring this action individually and on behalf of a class of similarly situated persons pursuant to Rule 23 of the Federal Rules of Civil Procedure.

290. Plaintiffs bring this action on behalf of themselves and the following class:

> All persons and entities who invested funds pursuant to Joint Venture Agreements with Goliath and suffered losses as a result of the Goliath investment program.

291. Plaintiffs Presta, Presta LLC, Brantley, and CGB bring this action on behalf of themselves and the following Broad Financial subclass:

> All persons and all IRA-owned entities formed on behalf of such persons, who invested in Goliath through a SDIRA or IRA-owned entity established by Broad Financial.

292. Plaintiffs Steele, Bailey, and Politano bring this action on behalf of themselves and the following JPMorgan Chase subclass:

> All persons whose investment funds were transmitted to, deposited into, or routed through JPMorgan Chase accounts maintained for or used by Goliath.

293. Plaintiff Logwood brings this action on behalf of himself and the following Bank of America subclass:

> All persons whose investment funds were transmitted to, deposited into, or routed through Bank of America accounts maintained for or used by Goliath.

294. Plaintiffs Politano, CTI, CGB, and Presta LLC bring this action on behalf of themselves and the following Coinbase subclass:

> All persons whose investment funds were transmitted to, deposited into, or routed through Coinbase accounts maintained for or used by Goliath.

295. Excluded from the class and subclass definitions are 1) Defendants and any of their current or former officers, directors, employees, agents, or representatives; 2) any judge or magistrate assigned to this action, members of their staff, and any members of their immediate families; and 3) any person or entity whose total withdrawals, redemptions, or payments from the Goliath investment program exceeded the total amount of that person or entity's invested principal (i.e., "net winners").

296. Plaintiffs reserve the right to modify or amend the Class definitions as discovery and further investigation may warrant.

297. Numerosity. The members of the Class and subclasses are so numerous that joinder of all members is impracticable. Public filings in the criminal case against Delgado and related investigative materials indicate that Goliath raised hundreds of millions of dollars from thousands of investors across multiple jurisdictions. The identities of many Class members are presently known only to Defendants and third-party custodians, including financial institutions and self-directed IRA custodians that processed investor funds.

298. Commonality and Predominance. Common questions of law and fact exist as to all members of the Class and subclasses and predominate over any questions solely affecting individual members of the Class and subclasses. These questions are capable of common proof

and will generate common answers that drive the resolution of this litigation. The questions of law and fact common to the Class and subclasses include:

a. Whether Alston & Bird structured and documented the Goliath investment program through JVAs and related instruments;

b. Whether those agreements created a joint venture or partnership relationship among Goliath and investor participants;

c. Whether Alston & Bird owed duties to the joint venture and its partners, including investor participants;

d. Whether Alston & Bird knew or reasonably should have known that the Goliath investment program constituted the offer and sale of securities under federal and state law;

e. Whether Alston & Bird negligently or improperly opined that the investment structure did not implicate securities laws;

f. Whether Alston & Bird knew or reasonably should have known that investors and IRA custodians would rely upon its legal work in approving and funding investments;

g. Whether Alston & Bird's structuring advice and opinion letters enabled Goliath to solicit and obtain investor funds;

h. Whether Alston & Bird breached duties owed to the Class;

i. Whether Alston & Bird's conduct was a substantial factor in causing investor losses; and

j. The appropriate measure of damages sustained by the Class.

(*Broad Financial Subclass*)

a. Whether Broad Financial marketed and sold SDIRA and "checkbook control" retirement account structures for the purpose of facilitating investments in the Goliath enterprise;

b. Whether Broad Financial represented to investors that it would evaluate their contemplated investment and assist them in selecting the appropriate retirement-account structure;

c. Whether Broad Financial prepared, supplied, or materially tailored operating agreements or other governing documents for IRA-owned entities used to invest in Goliath;

d. Whether Broad Financial knew that the structures it created were being used to channel retirement funds into the Goliath Ponzi scheme;

e. Whether Broad Financial's conduct substantially assisted the Goliath scheme by enabling investors to transfer retirement funds into that enterprise; and

f. Whether the Broad Financial subclass suffered damages as a result of Broad Financial's conduct, and the appropriate measure of such damages.

(*JPMorgan Chase and Bank of America Subclasses*)

a. Whether Goliath and Delgado engaged in a fraudulent investment scheme;

b. Whether Delgado used the Goliath JPMorgan Chase account and the Goliath Bank of America account to perpetrate the alleged fraud;

c. Whether JPMorgan Chase and Bank of America had actual knowledge of the fraudulent conduct at issue;

d. Whether JPMorgan Chase and Bank of America substantially assisted the fraud; and

e. Whether the JPMorgan Chase and Bank of America subclass members were damaged as a result of JPMorgan Chase and Bank of America's conduct.

(*Coinbase Subclass*)

f. Whether Goliath and Delgado engaged in a fraudulent investment scheme;

g. Whether Delgado used the Goliath Coinbase account to perpetrate the alleged fraud;

h. Whether Coinbase had actual knowledge of the fraudulent conduct at issue;

i. Whether Coinbase substantially assisted the fraud; and

j. Whether the Coinbase subclass members were damaged as a result of Coinbase's conduct.

299. Typicality. Plaintiffs' claims against Defendants are typical of the claims of the members of the Class and subclasses. Plaintiffs and Class members were all victims of the fraudulent scheme, each has claims against Defendants relating to the scheme, and each claim will depend on common proof of Defendants' wrongful conduct.

300. Adequacy. Plaintiffs will fairly and adequately protect the interests of the members of the Class and subclasses and have retained counsel competent and experienced in class action and financial fraud litigation.

301. Superiority. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same fraudulent scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

302. In the alternative, the Class and subclasses may be certified because: (a) the prosecution of separate actions by the individual Class members would create a risk of inconsistent adjudications; (b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of interests of non-party Class members or which would substantially impair their ability to protect their interest; and (c) Defendants have acted or refused

to act on grounds generally applicable to the Class and subclass, thereby making appropriate final and injunctive relief with respect to the members of the Class and subclasses as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)
### (By all Plaintiffs against Alston & Bird)

303. Plaintiffs reallege and incorporate by reference paragraphs 5 through 12, 21 through 78, and 224 through 302 as if fully set forth herein.

304. At all relevant times, Alston & Bird was a law firm engaged in the practice of law and held itself out as possessing specialized knowledge and expertise in securities regulation, investment structuring, and financial transactions.

305. In connection with the formation and operation of the Goliath investment program, Alston & Bird undertook to structure the enterprise, draft the governing JVAs and related transactional documents, and render legal advice and opinions regarding the regulatory status of the investment structure.

306. The services performed by Alston & Bird were not limited to internal advice to its client. Rather, Alston & Bird structured the very investment vehicle through which capital was solicited from members of the public and prepared legal instruments and opinions intended to facilitate the participation of investors in that enterprise.

307. Alston & Bird knew, or reasonably should have known, that prospective investors and financial intermediaries—including self-directed IRA custodians—would rely upon Alston & Bird's legal work in evaluating the legitimacy and regulatory compliance of Goliath.

308. Alston & Bird further knew that its structuring advice and legal opinions would be used to induce individuals and entities to contribute substantial capital to the enterprise through the JVAs. Alternatively, even if the enterprise ultimately did not constitute a valid joint venture or

partnership, Alston & Bird created and documented the legal framework through which investors were expressly represented to occupy that role and through which their capital was solicited and deployed. In doing so, Alston & Bird knowingly placed investors in the position of relying upon the legal structure and documentation it prepared to define their rights, obligations, and legal relationship to the enterprise.

309. Under the terms of those agreements, each capital contributor was designated a "partner" in a joint venture with Goliath. To the extent the JVAs created a joint venture or partnership under applicable law, Alston & Bird's legal services were rendered to the enterprise itself and therefore extended to its partners, including investor participants.

310. Additionally, Alston & Bird's legal services were performed for the benefit of, and with the foreseeable and intended reliance of, the investor participants whose capital was solicited pursuant to the JVAs. Indeed, the JVAs and Defendant's related legal work were specifically designed to enable the solicitation and acceptance of investor capital and to provide legal assurances regarding the legitimacy and regulatory status of the investment structure.

311. As a result of these circumstances, Alston & Bird owed duties of professional care to the joint venture enterprise and its investor partners, including investor participants, and/or intended beneficiaries of Alston & Bird's legal services, including Plaintiffs and members of the Class. Under Florida law, attorneys may owe duties of care to intended third-party beneficiaries of their legal services even in the absence of strict privity where the legal work is undertaken for the primary purpose of benefiting or affecting those parties.

312. Alston & Bird owed Plaintiffs and the Class a duty to exercise the degree of care, skill, diligence, and competence that reasonably prudent attorneys would exercise under similar circumstances.

313. Among other obligations, Alston & Bird had a duty to:

a. conduct reasonable diligence concerning the structure and operation of the investment program;

b. ensure that the legal structure used to raise investor funds complied with applicable federal and state securities laws;

c. accurately evaluate whether the investment structure constituted the offer and sale of securities under applicable law;

d. avoid structuring transactions in a manner designed to circumvent investor-protection statutes;

e. refrain from issuing legal opinions that were unsupported by the economic realities of the transaction; and

f. warn foreseeable investors and intermediaries of material legal risks associated with the investment structure.

314. Alston & Bird breached these duties through multiple acts and omissions, including but not limited to:

a. structuring and documenting an investment program that, in economic substance, constituted the offer and sale of securities while representing that the structure fell outside the securities laws;

b. preparing JVAs that mischaracterized passive investors as "partners" despite the absence of meaningful managerial control;

c. issuing or authorizing legal opinions suggesting that the investment structure complied with applicable law when the economic realities of the transaction indicated otherwise;

d. failing to recognize or disclose that the structure exposed investors to significant regulatory and fraud-related risks; and

e. enabling the fundraising activities of Goliath without implementing safeguards or disclosures consistent with professional standards.

315. Alston & Bird knew or reasonably should have known that its legal work would be relied upon by investors and financial intermediaries in determining whether to approve and fund investments in the enterprise.

316. Alston & Bird's conduct fell below the professional standard of care applicable to attorneys engaged in structuring investment transactions and advising on securities-law compliance.

317. Alston & Bird's negligence was a substantial factor in enabling Goliath to solicit and obtain hundreds of millions of dollars from investors under the guise of joint venture participation.

318. But for Alston & Bird's deficient structuring advice and legal opinions, the Goliath investment program could not have been marketed and sold in the manner in which it was.

319. Alston & Bird's professional negligence exposed Plaintiffs and members of the Class to an unlawful and unsupervised investment scheme that ultimately collapsed.

320. As a direct and proximate result of Alston & Bird's breaches of duty, Plaintiffs and the Class suffered substantial damages, including the loss of invested capital and other consequential financial harm.

321. Plaintiffs and the Class are therefore entitled to recover all damages caused by Alston & Bird's professional negligence, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(By all Plaintiffs against Alston & Bird)**

322. Plaintiffs reallege and incorporate by reference paragraphs 5 through 12, 21 through 78, and 224 through 302 as if fully set forth herein.

323. The JVAs governing the Goliath investment program expressly designated investor participants as "partners" in a joint venture with Goliath.

324. Under Florida law, a joint venture constitutes a form of partnership in which the participants owe fiduciary duties to one another and to the enterprise.

325. Alston & Bird was retained to structure, document, and provide legal validation for the Goliath joint venture enterprise, including drafting the governing JVAs and issuing legal opinions regarding the regulatory status of the investment structure.

326. In undertaking these responsibilities, Alston & Bird provided legal services integral to the creation and operation of the joint venture itself.

327. To the extent the JVAs created a partnership or joint venture under applicable law, Alston & Bird's legal services were rendered to the joint venture enterprise and therefore extended to its partners, including investor participants such as Plaintiffs and members of the Class.

328. Alternatively, even if the enterprise ultimately did not constitute a valid joint venture or partnership, Alston & Bird created and documented the legal framework through which investors were expressly represented to occupy that role and through which their capital was solicited and deployed. In doing so, Alston & Bird knowingly placed investors in the position of relying upon the legal structure and documentation it prepared to define their rights, obligations, and legal relationship to the enterprise.

329. Alston & Bird further undertook legal services that were intended to benefit, and were foreseeably relied upon by, the investor participants whose capital was solicited through the

JVAs. The JVAs and related legal documentation drafted by Alston & Bird were not merely internal agreements between Goliath and its counsel; rather, they were the operative legal instruments governing investor participation in the enterprise and defining the rights and status of investor participants.

330. Alston & Bird knew, or reasonably should have known, that investors and financial intermediaries—including self-directed IRA custodians—would rely upon Alston & Bird's legal work in evaluating the legitimacy and compliance of the investment structure.

331. By structuring the enterprise, drafting the governing agreements, and issuing legal opinions designed to facilitate investor participation, Alston & Bird assumed duties to the joint venture enterprise and to its partner-investors under principles including, but not limited to, the intended third-party beneficiary doctrine and the invited-reliance doctrine.

332. Alston & Bird's conduct also created a relationship of trust and confidence between Alston & Bird and the investor participants whose rights and obligations were defined by the legal instruments Alston & Bird drafted.

333. As a result of these relationships and undertakings, Alston & Bird owed fiduciary duties to Plaintiffs and members of the Class.

334. These fiduciary duties included duties of loyalty, candor, independence, and good faith, as well as the duty to exercise reasonable professional judgment in structuring and validating the enterprise.

335. Alston & Bird also owed duties to avoid conflicts of interest, to refrain from facilitating unlawful or misleading investment structures, and to disclose material legal risks associated with the enterprise.

336. Alston & Bird breached its fiduciary duties through multiple acts and omissions, including but not limited to:

a. structuring and documenting an investment program that mischaracterized passive investors as "joint venture partners" despite the absence of meaningful managerial authority;

b. enabling the solicitation of investor funds through a structure that avoided the regulatory protections of federal and state securities laws;

c. issuing or authorizing legal opinions suggesting that the investment structure complied with applicable law despite the economic realities of the transaction;

d. failing to disclose material legal and structural risks inherent in the investment program;

e. permitting its legal work and reputation to be used as assurances of legitimacy in connection with the solicitation of investor funds; and

f. failing to exercise independent professional judgment in evaluating the legality and risks of the enterprise.

337. Alston & Bird knew or reasonably should have known that its actions would enable Goliath to solicit and obtain substantial capital from investors under the guise of joint venture participation.

338. Alston & Bird's breaches of fiduciary duty facilitated the operation of an investment scheme that ultimately resulted in the loss of hundreds of millions of dollars contributed by investors.

339. Alston & Bird's conduct was a direct and proximate cause of the damages suffered by Plaintiffs and members of the Class.

340. As a result of Alston & Bird's breaches of fiduciary duty, Plaintiffs and the Class suffered substantial financial losses, including the loss of invested capital and other consequential damages.

341. Plaintiffs and the Class are therefore entitled to recover damages caused by Alston & Bird's breaches of fiduciary duty, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**CONSTRUCTIVE FRAUD**
**(By all Plaintiffs against Alston & Bird)**

342. Plaintiffs reallege and incorporate by reference paragraphs 5 through 12, 21 through 78, and 224 through 302 as if fully set forth herein.

343. At all relevant times, Alston & Bird occupied a position of trust and confidence with respect to Plaintiffs and members of the Class by virtue of Alston & Bird's role in structuring and documenting the legal framework governing the Goliath investment enterprise.

344. As alleged above, Alston & Bird structured, drafted, and validated the Goliath joint venture enterprise, including preparing the JVAs, subscription materials, and related legal documentation governing the investment program.

345. Through these activities, Alston & Bird provided legal services to the joint venture enterprise and undertook responsibilities that directly affected the rights and interests of the investor-partners participating in the enterprise.

346. Alston & Bird further knew that its legal work—including the structuring of the JVAs and the issuance of legal opinions regarding the regulatory status of the investment program—would be relied upon by investors and by financial intermediaries facilitating investor participation.

347. Alston & Bird therefore knew or reasonably should have known that investors would place trust and confidence in the legal structure and documentation Alston & Bird prepared in determining whether to participate in the investment program.

348. In the course of structuring and documenting the investment enterprise, Alston & Bird made representations—both express and implied—regarding the legal validity, regulatory compliance, and structural integrity of the joint venture program. These representations arose not only from Alston & Bird's written legal opinions but also from the legal framework and documentation Alston & Bird drafted to govern the investment enterprise.

349. Alston & Bird also omitted material facts concerning the risks and structural deficiencies inherent in the enterprise.

350. Among other things, Alston & Bird failed to disclose material information including, but not limited to:

a. the substantial risk that the investment program constituted the offer and sale of securities under federal and state law;

b. the absence of meaningful managerial control by investor participants despite their designation as "joint venture partners";

c. the legal and regulatory risks associated with structuring the enterprise to avoid securities registration and investor protection requirements;

d. structural weaknesses that created foreseeable opportunities for the misuse or misappropriation of investor funds; and

e. conflicts and risks arising from Alston & Bird's role in facilitating the investment structure while allowing its legal work to be used to assure investors of the enterprise's legitimacy.

351. These omissions concerned material facts that a reasonable investor would have considered important in deciding whether to participate in the Goliath investment program.

352. Alston & Bird knew or reasonably should have known that investors would rely upon the legal structure and legal opinions it provided when deciding whether to contribute capital.

353. Plaintiffs and members of the Class reasonably relied upon Alston & Bird's structural representations, legal work, and omissions when deciding to invest in the joint venture

enterprise. Such reliance was foreseeable and intended because Alston & Bird's legal work defined the investment structure through which investor participation was solicited and governed.

354. Alston & Bird's omissions and structural representations materially misled investors regarding the legality, risks, and regulatory status of the investment program.

355. By virtue of the trust and confidence created by Alston & Bird's role in designing and documenting the investment structure—and the foreseeable reliance of investors on that work— Alston & Bird had a duty to disclose material information necessary to ensure that investors were not misled by the structure and legal documentation it created.

356. Alston & Bird breached that duty by failing to disclose material risks and deficiencies while permitting the enterprise to be presented to investors as a legitimate and compliant joint venture structure.

357. Alston & Bird's conduct constituted an abuse of the position of trust and confidence it occupied with respect to Plaintiffs and the Class.

358. Alston & Bird's actions therefore constitute constructive fraud under applicable law.

359. Alston & Bird's constructive fraud materially misled investors and induced the contribution of substantial capital to the Goliath enterprise.

360. As a direct and proximate result of Alston & Bird's conduct, Plaintiffs and members of the Class suffered substantial financial losses, including the loss of invested capital and other consequential damages.

361. Plaintiffs and the Class are therefore entitled to recover damages caused by Alston & Bird's constructive fraud, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE**
**(On behalf of Plaintiff Presta, Presta LLC, Brantley, and CGB and the Broad Financial Subclass, against Broad Financial)**

362. Plaintiffs Presta, Presta LLC, Brantley, and CGB reallege and incorporate by reference paragraphs 13 through 14, 21 through 54, 79 through 158, and 224 through 302 as if fully set forth herein.

363. Broad Financial owed Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass a duty to exercise reasonable care in providing the specialized, investment-specific SDIRA and checkbook-control services it marketed and sold. That duty ran to Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass members as the investors who purchased, relied upon, and paid for those services, and to the LLC as the entities formed, organized, and governed by Broad Financial's services and the direct recipient of the defective document preparation at issue.

364. That duty included reasonable care in evaluating whether the contemplated investment fit the structure Broad Financial was selling, in warning of material incompatibilities and compliance risks, and in refraining from legal-document preparation and investment-specific guidance it was not competent or licensed to provide.

365. Broad Financial breached those duties by, among other things: (a) representing that it would help select the right plan for the contemplated investment; (b) failing to identify, disclose, or warn that the contemplated Goliath transaction was unsuitable or incompatible with the Broad Financial structure or created serious prohibited-transaction and compliance risk; (c) preparing, supplying, or causing the preparation of legal or governing documents without proper licensure or counsel; (d) failing to advise Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass to obtain independent counsel before proceeding; (e) facilitating movement of

retirement funds into the Broad Financial-created structure for the contemplated transaction; and (f) placing fee generation ahead of consumer protection and compliance.

366. It was foreseeable that investors would rely on Broad Financial's marketed expertise and that negligent structuring or guidance could cause loss of retirement funds and related economic harm.

367. Broad Financial's negligence was a direct and proximate cause of Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass's damages.

368. Broad Financial's negligence was not merely ordinary inadvertence but constituted gross negligence in that Broad Financial acted with reckless indifference to, and conscious disregard of, known and obvious risks that its conduct would cause the loss of Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass's retirement funds and expose them to severe legal, tax, and financial harm.

369. Specifically, Broad Financial knew or was generally aware that it was processing a concentrated stream of investors referred by the same promoters into the same purported investment program; knew that the contemplated transactions involved the rapid movement of retirement funds into an unregistered joint-venture structure marketed with fixed or low-risk returns inconsistent with legitimate liquidity-pool activity; knew that federal regulators had long warned that SDIRA and checkbook-control structures were frequently used to facilitate fraud; and nevertheless proceeded to form entities, prepare or supply governing documents, and facilitate the transfer of retirement funds without implementing reasonable safeguards, conducting meaningful diligence, or requiring independent legal review.

370. Broad Financial's conduct further constituted gross negligence because it consciously chose to prioritize fee generation and transaction volume over consumer protection

and compliance, ignored clear and repeated red flags concerning the nature and structure of the Goliath investment program, and continued to enable the movement of retirement funds into that program despite possessing information that would have caused a reasonable SDIRA facilitator exercising even slight care to halt or refuse to facilitate the transactions.

371. By reason of the foregoing reckless and grossly negligent conduct, Broad Financial's actions warrant the imposition of all available legal and equitable remedies, including but not limited to compensatory, consequential, and other enhanced damages permitted by law.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(On behalf of Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial Subclass, against Broad Financial)**

372. Plaintiffs Presta, Presta LLC, Brantley, and CGB reallege and incorporate by reference paragraphs 13 through 14, 21 through 54, 79 through 158, and 224 through 302 as if fully set forth herein.

373. Broad Financial, in the course of its business and for the purpose of inducing investors to purchase its services, supplied false or misleading information, including that Broad Financial would evaluate the contemplated investment, help the consumer choose the right plan, provide an informed opinion about whether the planned investment would work with the self-directed platform, and create compliant governing documents for the structure it sold.

374. Those statements were false, misleading, or materially incomplete because Broad Financial did not provide the promised investment-specific suitability analysis with reasonable care and instead sold a structure that was not the right fit for the contemplated transaction and/or created material compliance risk.

375. Broad Financial made those representations negligently, at minimum, because it failed to exercise reasonable care or competence in obtaining or communicating information to Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass.

376. Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass justifiably relied on Broad Financial's representations and omissions in purchasing Broad Financial's services, forming the Broad Financial-created entity, moving retirement funds, and proceeding with the contemplated investment. That relationship of trust extended to the LLC entities as well, which Broad Financial itself created and whose governing documents Broad Financial drafted. This relationship placed the LLC entities in a position of inherent reliance on Broad Financial's competence and candor from the moment of its formation.

377. As a direct and proximate result, Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass suffered ascertainable and out-of-pocket losses, including Broad Financial's fees, transaction costs, professional fees, and retirement-investment losses.

**SIXTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial Subclass, against Broad Financial)**

378. Plaintiffs Presta, Presta LLC, Brantley, and CGB reallege and incorporate by reference paragraphs 13 through 14, 21 through 54, 79 through 158, and 224 through 302 as if fully set forth herein.

379. Broad Financial cultivated and accepted a position of trust and confidence by holding itself out as possessing superior expertise about SDIRA structures, investment-specific suitability, compliance, and document preparation; by inviting investors to disclose their planned investment; and by promising to select and implement the proper structure for that investment.

380. Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass reposed trust and confidence in Broad Financial with respect to whether the contemplated investment could properly be undertaken through the structure Broad Financial sold, how the entity should be formed, and what governing documents would be used.

381. Broad Financial therefore owed duties of loyalty, candor, honesty, and reasonable skill and care within the scope of that relationship.

382. Broad Financial breached those duties by steering Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass into a fee-generating structure that was not the right plan for the identified investment, by failing to disclose material incompatibilities and risks, by engaging in or directing unauthorized legal-document preparation, and by enabling the investment notwithstanding red flags and known or knowable structural defects.

383. Broad Financial's breach of fiduciary duty directly and proximately caused Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass's losses.

**SEVENTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial Subclass, against Broad Financial)**

384. Plaintiffs Presta, Presta LLC, Brantley, and CGB reallege and incorporate by reference paragraphs 13 through 14, 21 through 54, 79 through 158, and 224 through 302 as if fully set forth herein.

385. On information and belief, Goliath insiders, promoters, managers, soliciting agents, and/or other John/Jane Doe defendants who controlled, solicited, managed, or structured the contemplated joint-venture or partner investment owed fiduciary duties of loyalty, candor, and due care to Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass.

386. Those primary fiduciaries breached their duties by soliciting retirement-fund investments into the Goliath transaction through materially misleading statements, by concealing or failing to disclose material facts about the investment and its structure, and by inducing Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass members to participate in an allegedly fraudulent or structurally improper transaction.

387. Broad Financial knew, or was generally aware, that its role was part of an overall improper scheme or tortious course of conduct because Broad Financial knew the specific contemplated investment, knew the transaction was being pitched as a joint venture or partnership interest, knew investors were being asked to use retirement funds for that structure, and knew or that the structure Broad Financial sold was not the right fit or created material compliance risk.

388. Broad Financial gave substantial assistance to the primary breaches by, among other things, marketing investment-specific expertise, supplying or preparing the entity and operating documents, instructing investors how to fund the structure, facilitating movement of retirement assets into the vehicle, and lending legitimacy to the investment by packaging it as a compliant SDIRA/checkbook-control arrangement.

389. As a direct and proximate result of Broad Financial's substantial assistance, Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial subclass suffered damages.

**EIGHTH CAUSE OF ACTION**
**CIVIL ACTION FOR UNAUTHORIZED PRACTICE OF LAW**
**N.J.S.A. 2C:21-22a**
**(On behalf of Plaintiffs Presta, Presta LLC, Brantley, and CGB and the Broad Financial Subclass, against Broad Financial)**

390. Plaintiffs Presta, Presta LLC, Brantley, and CGB reallege and incorporate by reference paragraphs 13 through 14, 21 through 54, 79 through 158, and 224 through 302 as if fully set forth herein.

391. New Jersey law governs this claim (Civil Action for Unauthorized Practice of Law). N.J.S.A. 2C:21-22a is a territorial regulatory statute that prohibits the unauthorized practice of law in New Jersey and provides a private cause of action to persons who suffer ascertainable loss as a result of such conduct. No choice-of-law balancing test is required for this claim: the regulated conduct—the preparation of operating agreements and related legal documents, and the provision of investment-specific legal guidance—was performed by Broad Financial from its principal place of business in Montvale, New Jersey and delivered to investors from New Jersey. The unauthorized practice of law therefore occurred in New Jersey, within the territorial scope of N.J.S.A. 2C:21-22a and New Jersey Court Rule 1:21-1. New Jersey has a compelling and overriding interest in regulating the practice of law within its borders and enforcing its professional licensing requirements against entities operating within the state. That regulatory interest applies with equal force regardless of where the recipient of the unlicensed legal services resides. To the extent any Restatement (Second) § 145 analysis is nonetheless applied, the place of the wrongful conduct—the act of practicing law without a license—is New Jersey, and that factor is dispositive: the UPL violation attached at the moment Broad Financial prepared and delivered legal documents from its New Jersey offices, not at the moment of investor reliance or loss.

392. Broad Financial knowingly engaged in the unauthorized practice of law by preparing, drafting, supplying, or materially tailoring operating agreements and comparable legal or governing documents for consumer IRA LLCs or trusts, and by advising consumers about the contents and use of those documents in connection with a particular contemplated investment.

393. Broad Financial's conduct went beyond merely providing ministerial, fill-in-the-blank formation filings. It included legal document preparation and investment-specific structural guidance.

394. Neither Presta, Presta LLC, Brantley, CGB nor Broad Financial subclass members received a separate attorney engagement from a licensed New Jersey lawyer through Broad Financial for the drafting of the governing entity documents. The operating agreement was drafted by Broad Financial and delivered directly to Broad Financial subclass members as its governing instrument, without the involvement of independent counsel. The Broad Financial subclass LLC members are therefore direct victims of Broad Financial's unauthorized practice of law: they are the entity whose existence, governance, and investment activity were predicated entirely on the defective legal documents Broad Financial prepared without a license to do so.

395. Broad Financial's conduct went beyond simply handing Broad Financial subclass members' blank state forms. Broad Financial marketed document creation, structure customization, and investment-specific onboarding.

396. New Jersey Court Rule 1:21-1 provides that no person may practice law in New Jersey unless licensed. The New Jersey Unauthorized Practice of Law Committee has further stated that preparing operating agreements and similar legal documents is the practice of law and may only be performed by lawyers, while nonlawyers may not advise customers concerning the contents of formation documents.

397. New Jersey law provides that no person may practice law in the State unless licensed, that preparing operating agreements and similar legal documents is the practice of law, and that a person who suffers ascertainable loss from another's knowing unauthorized practice of law may bring a civil action for statutory and other relief.

398. Presta, Presta LLC, Brantley, CGB and Broad Financial subclass members suffered ascertainable loss as a result of Broad Financial's unauthorized practice of law. Broad Financial subclass members suffered ascertainable loss in the form of fees paid to Broad Financial for the services at issue, professional fees incurred in connection with the Broad Financial subclass LLC members' formation and the Goliath investment, and the loss of retirement savings that would not have been placed at risk absent Broad Financial's UPL-tainted structure. The Broad Financial subclass LLC members independently suffered ascertainable loss in the form of formation fees charged directly to it, the loss of all assets held within it, and the consequential losses flowing from having been organized and governed under documents prepared through the unauthorized practice of law. The ascertainable losses of Presta, Presta LLC, Brantley, CGB and Broad Financial subclass members are overlapping but legally distinct: the Broad Financial subclass members' loss is the loss of his or her retirement savings as the IRA's beneficial owner; the LLC members of the Broad Financial subclass' loss is the direct dissipation of its assets and the costs imposed on it by virtue of the defective governing documents it received.

399. Pursuant to N.J.S.A. 2C:21-22a, Presta, the Presta LLC, and Broad Financial subclass members seek all available legal and equitable relief, including statutory damages, treble-cost relief as provided by statute, restitution, declaratory relief, injunctive relief, attorneys' fees, and costs.

**NINTH CAUSE OF ACTION**
**NEW JERSEY CONSUMER FRAUD ACT**
**N.J.S.A. 56:8-1 et seq.**
**(On behalf of Plaintiff Presta, Presta LLC, Brantley, and CGB and the Broad Financial Subclass, against Broad Financial)**

400. Plaintiffs Presta, Presta LLC, Brantley, and CGB reallege and incorporate by reference paragraphs 13 through 14, 21 through 54, 79 through 158, and 224 through 302 as if fully set forth herein.

401. The NJCFA applies to the claims of Presta, Presta LLC, Brantley, and CGB and Broad Financial subclass members, regardless of their state of residence. All Broad Financial's conduct giving rise to this claim—its affirmative misrepresentations, unconscionable commercial practices, and knowing omissions—was made from and directed out of Broad Financial's principal place of business in New Jersey. Broad Financial is organized under the laws of New Jersey, operates its business from its principal place of business in Montvale, New Jersey, and performed all the representations, omissions, document preparation, and onboarding services at issue from that location. Under New Jersey's choice-of-law principles, New Jersey's consumer protection law follows conduct that originates from New Jersey to wherever its effects are felt. Under the multi-factor framework applied by the Third Circuit in *Maniscalco v. Brother Int'l Corp*., 709 F.3d 202 (3d Cir. 2013), the NJCFA applies to non-New Jersey residents where the defendant is headquartered in New Jersey and the misrepresentations and deceptive conduct originated from New Jersey—as is the case here. Presta, Presta LLC, Brantley, and CGB accordingly assert the NJCFA on behalf of a nationwide Broad Financial subclass.

402. Broad Financial sold services to the public for a fee, including SDIRA/checkbook-control onboarding, investment-specific intake, entity-formation services, operating-agreement or

trust-document services, and related support. Those services constitute "merchandise" within the meaning of the Consumer Fraud Act.

403. Broad Financial engaged in unlawful conduct within the meaning of N.J.S.A. 56:8-2, including affirmative misrepresentations, unconscionable commercial practices, and knowing omissions of material fact, by: (a) representing that it would evaluate consumers' contemplated investments and help them select the right retirement-account structure for that specific investment when it had no intention of, and did not perform, any genuine investment-specific suitability analysis; (b) representing that it would provide an honest assessment of whether the planned investment would work with the self-directed platform when it in fact rubber-stamped Goliath-referred investors into the same structure regardless of the transaction's suitability or legality; (c) representing that it would create a "compliant" operating agreement and IRA-LLC structure when it knew that the contemplated partner/control joint-venture structure presented serious prohibited-transaction risk under 26 U.S.C. § 4975 and was not a permissible use of the SDIRA structure it was selling; (d) holding itself out as a "Crypto Sanctuary" with "Alternative Asset Expertise" while lacking the competence, licensure, and independence necessary to provide the investment-specific legal and structural analysis it promised; and (e) omitting and concealing from consumers that it was operating as a referral conduit for Goliath affiliates, that it was not performing independent suitability review, that the documents it was drafting constituted the unauthorized practice of law, and that the structure it was selling was incompatible with the contemplated investment.

404. Broad Financial's unlawful conduct was a systematic, uniform course of business directed at consumers across the United States who sought to invest retirement funds through alternative-asset structures. Broad Financial processed dozens of Goliath-referred investors

through the same intake process, generated the same fees, and delivered the same defective services regardless of whether the transaction was suitable, legal, or in the consumer's interest.

405. Broad Financial's conduct had the capacity to mislead reasonable consumers. The misrepresentations and omissions alleged herein were material: a reasonable consumer would consider it important to know that the company purporting to guide them to the "right plan" for their retirement investment was not performing any genuine analysis, was not licensed to prepare the legal documents it was providing, had a financial relationship with the very promoters directing investors to its platform, and was facilitating a transaction that exposed the consumer's IRA to prohibited-transaction risk and potential disqualification. Presta, Presta LLC, Brantley, and CGB and Broad Financial subclass were in fact misled by Broad Financial's conduct and acted in reliance upon it.

406. As a direct and proximate result of Broad Financial's unlawful conduct, Presta, Presta LLC, Brantley, and CGB and Broad Financial subclass suffered ascertainable loss within the meaning of N.J.S.A. 56:8-19, including: (a) fees paid to Broad Financial for services that were not what Broad Financial represented them to be; (b) professional and transaction costs incurred in connection with the formation of the IRA LLC and the execution of the Goliath investment; (c) the loss of retirement savings deposited into and invested through the Broad Financial-created structure; and (d) the loss of the IRA LLC's assets, which were wholly consumed by the Goliath Ponzi scheme. These losses are quantifiable, out-of-pocket, and directly traceable to Broad Financial's misrepresentations, omissions, and unconscionable practices.

407. Broad Financial's unlawful conduct was the direct and proximate cause of Presta, Presta LLC, Brantley, and CGB and Broad Financial subclass's ascertainable losses. But for Broad Financial's misrepresentations and omissions, Presta, Presta LLC, Brantley, and CGB and the

Broad Financial subclass would not have engaged Broad Financial's services, would not have caused the LLC members of the Broad Financial subclass to be formed, would not have moved retirement funds into the Broad Financial-created structure, and would not have invested those funds in the Goliath Ponzi scheme through that structure.

408. Pursuant to N.J.S.A. 56:8-19, Presta, Presta LLC, Brantley, and CGB and Broad Financial subclass are entitled to recover treble damages, reasonable attorneys' fees, filing fees, and reasonable costs of suit.

**TENTH CAUSE OF ACTION**
**AIDING AND ABETTING FRAUD**
**(On Behalf of Plaintiffs Steele, Bailey, and Politano,**
**and the JPMorgan Chase Subclass Against JPMorgan Chase)**

409. Plaintiffs Steele, Bailey, and Politano reallege and incorporate by reference paragraphs 15, 21 through 54, 159 through 176, and 224 through 302 as if fully set forth herein.

410. As set forth above, Delgado and Goliath defrauded Plaintiffs Steele, Bailey, and Politano, and JPMorgan Chase Subclass members by promising them that their investment funds would be placed in liquidity pools that generated consistent returns, when in reality their money was instead used to pay existing investors and to fund Delgado's and Goliath's personal and corporate expenses.

411. Delgado and Goliath intentionally misrepresented and omitted material facts in connection with the purported investment opportunity into liquidity pools. Plaintiffs reasonably relied to their detriment on such representations and omissions by choosing to invest and depositing their money into Goliath's JPMorgan Chase and Bank of America accounts.

412. JPMorgan Chase aided and abetted Delgado's fraud and is accordingly liable for the damage caused to Plaintiffs Steele, Bailey, Politano, and JPMorgan Chase Subclass members.

Both banks knew of Delgado's fraudulent scheme as a result of performing their customer-due-diligence and anti-money laundering obligations and gave substantial assistance to the scheme.

413. As a result of JPMorgan Chase's aiding and abetting Delgado's and Goliath's fraud, Plaintiffs Steele, Bailey, and Politano and JPMorgan Chase Subclass members have been damaged in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs Steele, Bailey, and Politano**
**and the JPMorgan Chase Subclass Against JPMorgan Chase)**

414. Plaintiffs Steele, Bailey, and Politano reallege and incorporate by reference paragraphs 15, 21 through 54, 159 through 176, and 224 through 302 as if fully set forth herein.

415. Delgado and Goliath owed Plaintiffs Steele, Bailey, and Politano and JPMorgan Chase Subclass members a fiduciary duty based on the high degree of control and discretion they had over investors' money. Delgado and Goliath breached that duty by misappropriating investors' funds; instead of investing it in liquidity pools as promised, Delgado and Goliath used their money to pay existing investors and to enrich themselves.

416. JPMorgan Chase knew that Delgado solicited and accepted investments and that Goliath and Delgado owed investors a fiduciary duty to act in the best interests of those investors.

417. JPMorgan Chase also knew that Goliath and Delgado were breaching their fiduciary duties. As previously alleged, JPMorgan Chase learned of Delgado's and Goliath's fraudulent scheme in the course of performing their customer-due-diligence and anti-money laundering obligations. Yet instead of exposing the scheme, JPMorgan Chase substantially assisted Delgado and Goliath in operating the scheme and in breaching their fiduciary duties to Banking Plaintiffs Steele, Bailey, and Politano and JPMorgan Chase Subclass members.

418. As a result of JPMorgan Chase's aiding and abetting Delgado's and Goliath's breach of their fiduciary duties, Plaintiffs Steele, Bailey, and Politano and JPMorgan Chase Subclass members have been damaged in an amount to be determined at trial.

**TWELTH CAUSE OF ACTION**
**AIDING AND ABETTING FRAUD**
**(On Behalf of Plaintiff Logwood and the Bank of America Subclass Against Bank of America)**

419. Plaintiff Logwood realleges and incorporates by reference paragraphs 15, 21 through 54, 159 through 167, 177 through 184, and 224 through 302 as if fully set forth herein.

420. As set forth above, Delgado and Goliath defrauded Plaintiff Logwood and Bank of America Subclass members by promising them that their investment funds would be placed in liquidity pools that generated consistent returns, when in reality their money was instead used to pay existing investors and to fund Delgado's and Goliath's personal and corporate expenses.

421. Delgado and Goliath intentionally misrepresented and omitted material facts in connection with the purported investment opportunity into liquidity pools. Plaintiffs reasonably relied to their detriment on such representations and omissions by choosing to invest and depositing their money into Goliath's Bank of America accounts.

422. Bank of America aided and abetted Delgado's fraud and is accordingly liable for the damage caused to Plaintiff Logwood and Bank of America Subclass members. Both banks knew of Delgado's fraudulent scheme because of performing their customer-due-diligence and anti-money laundering obligations and gave substantial assistance to the scheme.

423. As a result of Bank of America's aiding and abetting Delgado's and Goliath's fraud, Plaintiff Logwood and Bank of America Subclass members have been damaged in an amount to be determined at trial.

**THIRTEENTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff Logwood and the Bank of America Subclass against Bank of America)**

424. Plaintiff Logwood realleges and incorporates by reference paragraphs 15, 21 through 54, 159 through 167, 177 through 184, and 224 through 302 as if fully set forth herein.

425. Delgado and Goliath owed Plaintiff Logwood and Bank of America Subclass members a fiduciary duty based on the high degree of control and discretion they had over investors' money. Delgado and Goliath breached that duty by misappropriating investors' funds; instead of investing it in liquidity pools as promised, Delgado and Goliath used their money to pay existing investors and to enrich themselves.

426. Bank of America knew that Delgado solicited and accepted investments and that Goliath and Delgado owed investors a fiduciary duty to act in the best interests of those investors.

427. Bank of America also knew that Goliath and Delgado were breaching their fiduciary duties. As previously alleged, Bank of America learned of Delgado's and Goliath's fraudulent scheme in the course of performing its customer-due-diligence and anti-money laundering obligations. Yet instead of exposing the scheme, Bank of America substantially assisted Delgado and Goliath in operating the scheme and in breaching their fiduciary duties to Plaintiff Logwood and Bank of America members.

428. As a result of Bank of America's aiding and abetting Delgado's and Goliath's breach of their fiduciary duties, Plaintiff Logwood and Bank of America Subclass members have been damaged in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION
## AIDING AND ABETTING FRAUD
## (On Behalf of Politano, CTI, CGB, and Presta LLC and the Coinbase Subclass Against Coinbase)

429. Plaintiffs Politano, CTI, CGB, and Presta LLC reallege and incorporate by reference paragraphs 16 through 20, 21 through 54, and 185 through 302 as if fully set forth herein.

430. Goliath, Delgado, and their co-conspirators engaged in a fraudulent scheme to solicit and obtain investor funds through material misrepresentations and omissions.

431. Among other things, Goliath represented that investor funds would be deployed into cryptocurrency liquidity pools and trading strategies designed to generate consistent returns.

432. These representations were false. In reality, Goliath operated a Ponzi scheme in which new investor funds were used to pay purported returns to earlier investors, while substantial amounts were misappropriated.

433. Plaintiffs Politano, CTI, CGB, and Presta LLC and Coinbase subclass members reasonably relied on these misrepresentations in transferring funds to Goliath and suffered substantial losses as a result.

434. Coinbase had actual knowledge of the fraudulent nature of Goliath's scheme.

435. Coinbase maintained accounts through which Goliath received, converted, and transferred investor funds, and Coinbase had direct visibility into the transaction activity conducted through those accounts.

436. Coinbase knowingly and substantially assisted Goliath's fraudulent scheme.

437. As a direct and proximate result of Coinbase's conduct, Plaintiffs Politano, CTI, CGB, and Presta LLC and Coinbase subclass have suffered damages in an amount to be determined at trial.

**FIFTEENTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(On Behalf of Politano, CTI, CGB, and Presta LLC and the Coinbase Subclass Against Coinbase)**

438. Plaintiffs Politano, CTI, CGB, and Presta LLC reallege and incorporate by reference paragraphs 16 through 20, 21 through 54, and 185 through 302 as if fully set forth herein.

439. Goliath, Delgado, and their co-conspirators owed fiduciary duties to Plaintiffs Politano, CTI, CGB, and Presta LLC and Coinbase subclass members.

440. By soliciting and accepting investor funds pursuant to Joint Venture Agreements, Goliath and its principals undertook to act on behalf of Plaintiffs Politano, CTI, CGB, and Presta LLC and Coinbase subclass members with respect to the management, investment, and disposition of those funds.

441. This relationship created duties of loyalty, care, good faith, and full disclosure, including the duty to use investor funds solely for their intended investment purposes and to refrain from self-dealing, misappropriation, and misuse of entrusted assets.

442. Goliath and its principals exercised exclusive control over investor funds once those funds were transferred pursuant to the Joint Venture Agreements, and investors did not retain the ability to direct, monitor, or independently verify the use of their assets.

443. In entrusting their funds to Goliath for investment and management, Plaintiffs Politano, CTI, CGB, and Presta LLC and Coinbase subclass placed confidence in Goliath to act in their best interests, thereby creating a relationship of trust and confidence characteristic of a fiduciary relationship.

444. Goliath, Delgado, and their co-conspirators breached their fiduciary duties by, among other things:

a. misrepresenting the nature and use of investor funds;

b. failing to deploy funds into legitimate investment strategies as promised;

c. misappropriating investor funds for unauthorized purposes;

d. using new investor funds to pay purported returns to earlier investors; and

e. engaging in self-dealing and conduct designed to conceal the true nature of the scheme.

445. These actions constituted a wholesale breach of fiduciary obligations and resulted in substantial losses to Plaintiffs Politano, CTI, CGB, and Presta LLC and Coinbase subclass members.

446. Coinbase had actual knowledge of the breaches of fiduciary duty described herein.

447. Coinbase knowingly provided substantial assistance to Goliath's breaches of fiduciary duty.

448. As a direct and proximate result of Coinbase's conduct, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully requests that the Court enter judgment in their favor and grant the following relief:

a. An order certifying the proposed Class and Subclasses and appointing the undersigned counsel as class counsel;

b. An award of damages in an amount to be determined at trial;

c. Pre-judgment and post-judgment interest, as provided by law;

d. An award of Plaintiffs' reasonable attorneys' fees and litigation costs; and

e. Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted this 6th day of May, 2026 by:

*s/ Adam A. Schwartzbaum*
**SCHWARTZBAUM**
Adam A. Schwartzbaum, Esq.
Fla. Bar No. 93014
14 NE 1st Ave Suite 705
Miami, FL 33132
adam@schwartzbaum.com
Tel: 305-725-1245

*s/ Jeffrey R. Sonn*
**SONN LAW GROUP**
Jeffrey R. Sonn, Esq.
Fla. Bar No. 773514
Brian Pastor
Florida Bar. No. 998826
19495 Biscayne Blvd.,
Suite 607
Aventura, FL 33180
jsonn@sonnlaw.com
bpastor@sonnlaw.com
Tel: 305-912-3000

*s/ Jordan Shaw*
**SHAW LEWENZ**
110 SE 6th Street, Suite 2900
Fort Lauderdale, FL 33301
Jordan A. Shaw, Esq.
Fla. Bar No. 111771
jshaw@shawlewenz.com
Gabriel E. Morales, Esq.
Fla. Bar No. 1038778
gmorales@shawlewenz.com
Tel: 954-361-3633

*s/ T. Liam Murphy*
**MURPHY'S LAW: THE CRYPTO LAW FIRM**
T. Liam Murphy, Esq.*
353 Lexington Avenue
4th Floor, Suite 400
New York City, New York 10016
liam@murphyslawcrypto.com
Tel: 913-575-0540

**Admitted Pro Hac Vice*

*/s/ Scott L. Silver*
**SILVER LAW GROUP**
Scott L. Silver
Florida Bar No.: 095631
Ryan A. Schwamm
Florida Bar No.: 1019116
Peter M. Spett
Florida Bar No. 0088840
1780 W. Sample Road
Coral Springs, FL 33065
T: (954) 755-4799
F: (954) 755-4684
E-Mail: ssilver@silverlaw.com
rschwamm@silverlaw.com
pspett@silverlaw.com

*/s/ David Stein*
**GIBBS MURA LLP**
David Stein (*pro hac vice* to be submitted)
Linda P. Lam (*pro hac vice* to be submitted)
1111 Broadway, Suite 2100
Oakland, CA 94607
T: (510) 350-9700
F: (510) 350-9701
E-Mail: ds@classlawgroup.com
lpl@classlawgroup.com

Emily Beale (*pro hac vice* to be submitted)
136 Madison Avenue, Suite 541
New York, NY 10016
T: (510) 350-9700
F: (510) 350-9701
E-Mail: eb@classlawgroup.com